Clark WESTFALL, by his guardian ad litem, Thomas Ter-
williger, and Harland Westfall and Dores Westfall,
his parents, Plaintiffs-Appellants-Petitioners,

v.

Walter KOTTKE and Wayne Kottke,
Defendants-Respondents.

Supreme Court

*No. 80–2227. Argued September 7, 1982.—Decided
January 5, 1983.*

(Also reported in 328 N.W.2d 481.)

88

For the plaintiffs-petitioners there was a brief by *Thomas Terwilliger* and *Terwilliger, Wakeen, Piehler, Conway & Klingberg, S.C.,* Wausau, and oral argument by *Thomas Terwilliger.*

For the defendants-respondents there was a brief by *David M. Erspamer* and *Cwayna, Novitzke, Byrnes, Gust & Williams,* Amery, and oral argument by *Mr. Erspamer.*

HEFFERNAN, J.   This is a review of an unpublished decision of the court of appeals dated September 8, 1981, that affirmed the circuit court's judgment, dismissing Clark Westfall's complaint, after a verdict finding Westfall 90 percent negligent and the defendant Walter Kottke 10 percent negligent.[1]   Westfall's complaint was for personal injuries sustained when the motorcycle he was operating collided with a farm tractor driven by Walter Kottke as Kottke made a left turn into a farm driveway.

Because of errors in the instructions, inconsistency of the verdict, and grossly inadequate damages, we reverse. We remand the cause for a new trial on all issues.

The record shows that Clark Westfall was fourteen years old at the time of the accident on July 17, 1978. He was not licensed to drive a motorcycle. He was driving his brother's cycle north on Highway S and was carrying a passenger, Jeffrey Block. As he was proceeding at a speed of 45–50 miles an hour, he saw a farm tractor ahead

[1] The trial to a jury was held in the Circuit Court for Marathon County, Ronald D. Keberle, Circuit Judge. Judgment was entered on November 24, 1980.

of him. It was later ascertained that the tractor was owned by Wayne Kottke and was being driven by his father, Walter Kottke.

Westfall saw the tractor ahead of him, and he pulled into the left lane to pass. When Westfall was about 90 feet from the tractor, it suddenly made a left turn into a farm field. Both Westfall and Block testified that Kottke did not signal the turn. Westfall acknowledges he did not sound his horn to signal his intention to pass. Westfall testified that only a second elapsed from the time of the tractor's turn to the time of impact. Kottke said two or three seconds elapsed from the time he began his turn to the time he was hit.

Kottke asserted that he looked to his rear three times prior to making the turn—once about 300 feet from the entrance to the farm, again 100 feet from the driveway, and as he reached the driveway he stopped, looked back, and put out his arm to signal a left turn. He said he did not see the motorcycle until almost the very instant of impact. There were no obstructions to Kottke's view, and it is undisputed that the motorcycle would have been in plain view if any of the alleged observations by Kottke were efficiently performed.

Westfall said he let up on the accelerator but did not have time to apply the brake. He steered for the left ditch because he thought the tractor might remain in the right lane. The impact occurred in the left lane, apparently very close to the edge of the road.

Clark Westfall sustained very serious injuries—a fractured pelvis, knee, leg, and collarbone and severe lacerations, including a large laceration of the scrotum. He suffered a cardiac arrest on the operating table on the day of the accident. He was in extreme pain for over a month. Several extensive surgical procedures were undertaken to correct and overcome his injuries. One procedure involved the complete removal of a hip, its recon-

struction, and its replacement. This required the removal of fragmented bones, their rearrangement to proper alignment, screwing them together, and the recreation of the hip socket. Westfall was in a cast from his chest to his toes for a period of two months. A less complete leg cast was needed for an additional period. Painful physical therapy then ensued. When he is older, Westfall will require a hip replacement and may also require a replacement of a knee joint.

The photographs in the record reveal severe scarring over most of his body below the waist. Several of these scars show that portions of the flesh have been gouged out. The evidence shows that Westfall is permanently disabled and will only be able to perform sedentary work. The evidence indicated that sedentary work was not the type of employment that a person of Westfall's qualifications could be expected to perform, and that, rather, he would have been best suited for construction work involving manual labor. An expert witness testified that Westfall's loss of earning capacity would be at least $5 per hour. He estimated that Westfall's lifetime loss of earnings would be $309,000.

Westfall walks with a permanent limp. One leg is one and one-half inches shorter than the other. He has constant pain and will develop arthritis as the result of the injury.

The jury found both Westfall and Kottke negligent. Although it found that Kottke's negligence was not causal, it nevertheless apportioned 10 percent of the negligence to Kottke and 90 percent to Westfall.

The verdict pursuant to stipulation awarded the sum of $26,414.06 for past medical expenses. The jury awarded $18,000 for future medical expenses and $10,000 for past *and* future pain, suffering, and humiliation. The jury awarded nothing for loss of earning capacity. The jury found that at the time of the accident Walter Kottke

was not the servant (agent) of his son, Wayne Kottke, the owner of the tractor.

Westfall's attorney moved for a new trial—because of alleged errors in the instructions, because the verdict was contrary to the evidence, because the damages were inadequate in respect to pain and suffering and loss of earning capacity, and because the verdict was perverse and inconsistent in respect to finding there was no causal negligence on Kottke and then attributing 10 percent of the negligence to him.

The trial judge acknowledged that there were errors in the course of the trial but ruled that they were not prejudicial. He amended the admittedly inconsistent verdict by changing the jury's answer in respect to Kottke's negligence being causal from "no" to "yes" and permitted the jury's apportionment to stand—90 percent negligence on the part of the plaintiff Westfall and 10 percent on defendant Kottke. Accordingly, he entered judgment on the verdict and dismissed the plaintiff's complaint.

The plaintiff Westfall appealed to the court of appeals, which affirmed.

We elected to review the decision of the court of appeals because it appeared that there were errors in instructions that might be prejudicial when viewed in the context of the record. More importantly, it appeared the review presented a significant question in respect to the disposition of inconsistent verdicts by trial courts. Additional facts will be discussed in the course of our discussion of the particular errors alleged.

■

Turning first to the verdict in respect to the jury's finding of negligence, cause, and apportionment, we find that, in respect to Kottke, the jury's verdict was clearly inconsistent and perverse. It found that Kottke was negligent, but not causally so, yet the jury assessed 10 percent of the negligence to Kottke. The trial court, without

expressing any rationale for its action, changed the answer in respect to cause from "no" to "yes."

We conclude this was error, and on this basis alone we are obliged to reverse and remand for a new trial on all issues. The trial court relied without explanation on *Bodden v. John H. Detter Coffee Co.*, 218 Wis. 451, 261 N.W. 209 (1935). In that case the jury was instructed:

". . . that in case they found that both parties 'by negligent operation of their respective automobiles, contributed to produce' the collision, they determine 'what proportion of all the negligence producing the collision is attributable' to each party." P. 452.

In answer to this question, the jury in *Bodden* assessed 10 percent to the plaintiff and 90 percent to the defendant. In response to another question, the jury found that the plaintiff was negligent as to lookout, but that such negligence was not a cause of the accident. Judgment was entered for the plaintiff for 100 percent of his damages. The defendants appealed. This court reversed, but it did so because it concluded that the instruction and answer in respect to what proportion of the negligence "contributed" to the negligence was implicitly a finding of cause. Hence, the court reversed, concluding that the effect of the jury's verdict under the particular instruction was to find 10 percent causal negligence on the plaintiff and 90 percent on the defendant. It treated as surplusage the finding that the plaintiff's negligence was not causal.

In the instant case, the jury was specifically instructed not to answer the comparative negligence question:

". . . unless you first find that more than one person was negligent and that the negligence of more than one person was a cause of the accident."

In the case before us, there is no leeway, as there was in *Bodden,* for reaching the conclusion that the jury

could reasonably have inferred that in answering the comparison question it was also answering the cause question.

Hence, although *Bodden* lends some credence to the position of the trial court, a position not commented upon by the court of appeals, we are not persuaded that *Bodden,* under its facts, supplies a precedent for the trial court's determination to treat the finding of no cause in respect to Kottke as mere surplusage.

In the instant case, it is clear that the jury, if it acted in conformity with its instructions, could not have found that Kottke's negligence was not causal and then proceed to attribute a proportion of the responsibility to him.

At any rate, after *Bodden,* the entire question of inconsistent verdicts was reassessed in *Statz v. Pohl,* 266 Wis. 23, 29, 62 N.W.2d 556 (1954). Therein we said:

"(1) If the issue of causal negligence is for the jury and the party inquired about is exonerated but the jury in its comparison of negligence erroneously attributes to such party some degree of causal negligence, the verdict is inconsistent, and a new trial must be granted;

"(2) If it be determined that the party inquired about is free from causal negligence as a matter of law and the jury has exonerated him but has also attributed to him some degree of causal negligence, then the court should strike the answer to the question on comparison as surplusage and grant judgment accordingly;

"(3) If the court can find as a matter of law that the party inquired about is guilty of causal negligence and the jury finds that he is not and in the question on comparative negligence attributes to him some degree of causal negligence, the court should change the answers to the questions which inquire as to his conduct from 'No' to 'Yes' and permit the jury's comparison to stand with judgment accordingly."[2]

---

[2] Paragraph 3 was modified in the rehearing on the case to make it applicable only "[i]f but one element of negligence is submitted to the jury." P. 32a. This modification was deleted in *Ollinger v.*

*Statz v. Pohl,* although attempting to define a standard which would save an inconsistent verdict, well stated the irreconcilable dilemma that a trial court faces when it fails to return a patently inconsistent verdict to the jury for correction.

The court therein said, in reference to a verdict similar to the one in the instant case:

". . . a verdict such as we have to deal with is inconsistent. The jury's findings cannot be reconciled. If we were to hold that there is no inconsistency we should be required to say that one or the other of the findings is surplusage or immaterial. The question would then be presented: Which? It is impossible to determine from the record or from any other source that the jury meant what it said in answer to one of the questions and that the answer to the other was thrown in only casually and without regard to the form of the questions and in disregard of the court's instructions." P. 28.

Despite the fact that the court in *Statz* found this dilemma to be unanswerable, it proceeded, in an effort to save the verdict, to answer the unanswerable by devising the three standards of *Statz v. Pohl.* The rationale of these standards was capsulized in *Hillstead v. Shaw,* 34 Wis. 2d 643, 652, 150 N.W.2d 313 (1967), when we said:

"Basically, *Statz v. Pohl* permits a court to cure an inconsistent verdict by changing answers, as long as the evidence established the change as a matter of law."

While this undoubtedly is the basis for the three-part rule in *Statz,* the trouble is that, if the answer is truly one that can be decided as a matter of law, the question should have been decided by the court in the first place and not by the jury. What *Statz* sought to remedy was

*Grall,* 80 Wis. 2d 213, 222, 258 N.W.2d 693 (1977). Accordingly, the three original standards of *Statz v. Pohl* were reinstated in 1977 to reflect the use of the ultimate fact verdict.

the failure of a trial judge to correct an inconsistent verdict when the jury was still available to make the correction. It appears to us that, when a verdict which is patently inconsistent is presented to the trial court, the jury then and there should be reinstructed and directed again on its duty to produce a verdict that conforms to the court's instructions.

We do not conclude, however, that the trial court in this particular instance was neglectful or derelict in its duty, because some of our past cases were susceptible to the interpretation that it could be preferable for the trial court to reserve ruling until motions after verdict, when the evidence could be carefully and deliberately weighed and assessed by the court. *See, Seif v. Turowski*, 49 Wis. 2d 15, 21, 181 N.W.2d 388 (1970).

A careful examination of *Seif* and other cases which have lent themselves to such interpretation reveals, however, that this court was expressing its position in respect to waiver of an objection to an inconsistent verdict, and its conclusion that failure of counsel to assert the inconsistency at the return of the verdict did not waive the right to object to the verdict on post-trial motions. We do not retreat from our position in respect to nonwaiver by the objecting party, but we do hold that, when that objection is made only in post-trial motions, an inconsistent verdict will result in a new trial and the verdict at that juncture cannot be saved.

We adopt the suggestion of John A. Decker and John R. Decker in *Special Verdict Formulation in Wisconsin*, 60 Marquette Law Rev. 201, 271–73 (1977). Therein the authors stated:

"Juries on occasion do fail to follow instructions and thus err in the answers to the special verdict. Sometimes prefatory instructions to special verdict questions are overlooked or disregarded. When that occurs, the

prospect of inconsistency in the verdict greatly increases. Cause questions may thus be answered affirmatively when the negligence question is answered negatively or a comparison of negligence is made attributing a percentage of total causal negligence to a person who has not been found causally negligent in earlier questions. Sometimes the sum of the apportioned negligence does not total 100%. Occasionally damage questions are not answered or are answered 'one day's wages' in response to a loss of earnings inquiry, despite the dollar sign preface to the blank line for answer.

" . . .

"If the expenditure of effort in formulating and presenting the special verdict and instructions is unsuccessful, there remains in the trial court supervisory power to be exercised in connection with the return of the verdict. When a jury returns a verdict containing errors, inconsistencies or lack of compliance with the directions of the special verdict and instructions, the trial court may direct the jury's attention generally to the prospective error and require it to deliberate further to correct any errors that may exist. In doing so, the trial court must cautiously avoid suggesting which of the inconsistent answers is the error and must avoid dominating or dictating how an error or inconsistency is to be corrected.

"When excessive dissents are involved, the court must avoid any hint of coercing any dissenter. Probably the safest approach is to direct the jury's attention generally to the prospective error and reread the five-sixths instruction.

"The trial court has a duty to inspect the special verdict and direct the jury to complete its answers. Exercise of the authority to direct the jury to retire for further deliberations to correct inconsistencies or errors will usually result in a special verdict correction that avoids a new trial. Inspection of the special verdict before it is received and the jury discharged or disbanded, or when returning a sealed verdict, will enable one to identify at least the obvious errors, inconsistencies or ambiguities and provide an opportunity for correction. In a multiple party-multiple claim special verdict, the inspection will require more than a casual glance and a conference with counsel is helpful. If errors or inconsistencies are dis-

covered, the special verdict answers should be incorporated in the record in the jury's absence before being corrected so that the rights of the parties are preserved. Waiver of a portion of claimed damages may eliminate dissents or otherwise rectify an inconsistency." Pp. 271–73.

We note that a great deal of judicial and attorney time and thought is spent in framing instructions and special verdicts. Frequently, special verdicts returned by a jury are of great, and sometimes puzzling, complexity. A trial judge should take the time and opportunity to carefully consider a verdict before announcing it as the verdict of the jury. Unless the judge can instantly conclude that the verdict is proper, it is appropriate for the judge, upon the receipt of the verdict, to retire to chambers to consider whether the verdict is consistent and correct as to form before accepting the verdict. In the event reinstruction of the jury is necessary, counsel should, of course, be consulted and be given an opportunity to make suggestions or objections.

The trial judge in the instant case, upon the return of the verdict, determined that the five-sixths rule was not observed in respect to all questions. He immediately reinstructed the jury and gave the jury the opportunity to reconsider its action. It did so and returned with a verdict that satisfied that rule. Had consideration been given at that time to the inconsistent verdict, no doubt the jury could then and there have corrected its error.

We conclude that when a verdict is inconsistent, such verdict, if not timely remedied by reconsideration by the jury, must result in a new trial.

We allude also to the last quoted sentence of the Marquette Law Review article: "Waiver of a portion of claimed damages may eliminate dissents or otherwise rectify an inconsistency." P. 273. This statement from the Decker article is based on *Krueger v. Winters*, 37

Wis. 2d 204, 155 N.W.2d 1 (1967), in which this court stated that a party harmed by jurors' dissents to a particular question, which made the verdict violative of the "five-sixths" rule, could waive a claim to the particular verdict item and thus preserve the balance of the verdict.

The article also, however, refers to waiver of any claims arising out of inconsistent verdicts. This appears to be in reference to such cases as *Erdmann v. Wolfe,* 9 Wis. 2d 307, 101 N.W.2d 44 (1960). Therein the jury returned an inconsistent verdict in that it found the plaintiff negligent, but not causally so, but then went on to find the plaintiff five percent negligent. Ninety-five percent of the causal negligence was attributed to the defendant. This court permitted the plaintiff to waive the claim for a 100 percent verdict, even though the trial court could not properly have found as a matter of law that plaintiff was not causally negligent in any degree. Rather, this court held that:

"Where the verdict, because of the inconsistent answers, will not support a judgment for 100 per cent of the damages, but plaintiff *prefers* to take judgment for the amount which the verdict will support if the inconsistency be resolved against plaintiff, there is no sound reason for the delay and expense of a new trial merely to resolve the inconsistency." (Emphasis supplied) P. 314.

In circumstances such as that in *Erdmann,* a waiver would appear to be appropriate. It would not affect who would be the prevailing party. It would only result in a diminution of the prevailing party's damages. Accordingly, we do not withdraw the discretion of the trial court to amend a verdict when the party injured by the inconsistency waives a portion of its damage claim and the waiver does not result in a change of the prevailing party as found by the jury.

The allowance of such waiver is, however, within the discretion of the trial judge. *See, Jahnke v. Smith,* 56

Wis. 2d 642, 651, 203 N.W.2d 67 (1973), in respect to circumstances under which such waiver can appropriately be utilized. In essence, this court said in *Jahnke* that a waiver should be rejected when the jury apportioned negligence by such a narrow margin that would indicate a new trial could arrive at a different result or where the facts indicate that there could be a close question on the apportionment of negligence. As our further discussion will indicate, the rectification of other errors that occurred in the present case could well reverse the result or substantially alter the apportionment as found by the jury upon remand.

In the instant case, we conclude and hold that the inconsistency on the face of the verdict was irreconcilable, that having submitted the question of negligence in respect to both parties to the jury, it was inappropriate as a matter of hindsight to resolve the question of negligence or of cause in respect to either party as a matter of law. Henceforth, in the event of an inconsistent verdict which is not properly subject to a waiver of claim by the objecting party, and which is not rectified by a resubmission under direction to the jury, a new trial is required. The tripartite rule set forth in *Statz v. Pohl, supra,* and its progeny, designed to save defective and inconsistent verdicts, is abrogated; and our expressions of the approval of such rationalization for preserving and reconciling such inconsistent verdicts are overruled.

This procedure, immediate resubmission of the verdict to the jury, will ordinarily result in a consistent verdict. There will not have to be a new trial in those cases which, under the present rule, the judge would not have been able to say whether a party was or was not negligent as a matter of law, and even where that decision could arguably be made, the judge need not face the question. The jury will be compelled to perform its function of properly determining the facts. Thus, judicial re-

sources can be conserved and the jury verdict can be kept immune from well intentioned, but relatively uninformed, judicial guesswork. The jury will be allowed to do its job. Unlike the reality under the present rule, there would be no pressure on the court to find one party or the other negligent as a matter of law, just to save a defective verdict. Of course a jury, despite careful reinstruction, could persist in returning an inconsistent verdict. This would require a new trial.

Accordingly, in the instant case the verdict of the jury must be set aside and the judgment of the circuit court dismissing the plaintiff's complaint must be reversed and the cause remanded for trial.

We note in passing, however, that the rule that we adopt herein in respect to inconsistent verdicts is not intended to affect the authority of a trial court to reserve a ruling on a motion made prior to submission of the verdict to a jury. Hence, the power of a court to rule on a motion for directed verdict following a jury's return is unaffected; and in instances where one party or another has moved to have a particular question in the verdict answered as a matter of law, a trial court which has reserved the ruling until after verdict has the option to make the ruling after the return of the verdict.

In addition to the error in respect to the inconsistent verdict, we find other errors warranting a reversal. The record reveals errors that probably would have led to an erroneous verdict even had the jury followed the directions of the trial court and returned a consistent verdict. Because the case must be retried and the same issues are likely to reappear on remand, we address ourselves to these errors.

As stated above, Kottke's tractor made the left turn into the driveway only a second or two prior to the impact. Westfall therefore claims he was faced with an emergency he did not create and asserts that he should

be exonerated from negligence in respect to the management and control of the motorcycle in response to that emergency. He claims that he was entitled to an emergency instruction in accordance with his timely request.

Three elements must be satisfied to warrant the emergency instruction: (1) The party seeking its benefits must be free of negligence contributing to the cause of the emergency; (2) the time element must be so short as to preclude a deliberate or intelligent choice; and (3) the element of negligence inquired into must concern management and control. *Leckwee v. Gibson,* 90 Wis. 2d 275, 288, 280 N.W.2d 186 (1979), and *Tombal v. Farmers Ins. Exchange,* 62 Wis. 2d 64, 70, 214 N.W.2d 291 (1974).

The last two elements are clearly satisfied. The more difficult question is whether the plaintiff Westfall was free of any negligence that contributed to the creation of the emergency. In determining whether an emergency instruction should have been given, we are obliged to view the evidence in a light most favorable to the party requesting the instruction. *Lutz v. Shelby Mut. Ins. Co.,* 70 Wis. 2d 743, 754, 235 N.W.2d 426 (1975). Hence, we must view any evidence that would tend to demonstrate any negligence of Westfall that contributed to the emergency in a light that is most favorable to him. Unfortunately, the trial court failed to make such analysis. The court simply referred to its conclusion that the plaintiff was negligent in several respects and its belief that, on the basis of the facts, the jury could have found the plaintiff Westfall more negligent than the defendant Kottke. This analysis, without more, is not analytically satisfactory, for it is based, apparently, on the conclusion that the plaintiff was negligent as to management and control because he failed to veer to the right, which would have enabled him to avoid contact with the tractor; and spe-

cifically the trial judge's opinion refers to the plaintiff's failure to apply his brake. It would appear that these omissions, if negligent, fall within the ambit of management and control, for which a party may be exonerated if the emergency leading to the conduct was not of his own making. It is inappropriate to consider conduct constituting lack of proper management and control as acts creating an emergency when analytically they may be the result of being faced with an emergency and not the result of the actor's pre-existing negligence.

There are a number of alleged acts of negligence referred to by the trial court that are clearly irrelevant to whether there was an emergency contributed to by Westfall. We pass over these for the moment to consider an omission that, arguably at least, is fatal to Westfall's claim that the jury should have been given the emergency instruction. The record is clear that Westfall did not sound his motorcycle horn at any time prior to the accident. Sec. 346.07 (1), Stats., provides:

"The operator of an overtaking motor vehicle . . . shall give audible warning with his warning device before passing or attempting to pass on the left a vehicle proceeding in the same direction. . . ."

Failure to sound a warning when one is required by law is negligence *per se*. But the question here is whether, viewing the facts most favorably to Westfall, as we must, the emergency—the unsignalled left turn by Kottke—occurred prior to the time Westfall was obliged to give warning.

The question is whether the emergency was created by Kottke's action alone or was contributed to by a failure to sound the horn. If Kottke's turn, and hence the emergency, occurred prior to the time Westfall was required to signal, his lack of signal did not contribute to the emergency; and, hence, the jury should have been in-

structed that he could be exonerated from negligent management and control in face of the emergency created by Kottke. There is obviously an unstated threshold point before an audible warning must be given. It must, by definition, be given within a distance that it can be heard. Hence, the mere fact that an accident occurred following the nonsounding of the warning does not indicate that the failure to give warning contributed to the emergency. There must be facts to show that the failure to warn, though negligent, contributed to the creation of the emergency.

As we view the record most favorably to Westfall, who requested the instruction, there is nothing to show that the failure to sound the motorcycle horn contributed to the emergency. In his court of appeals brief, Kottke's counsel acknowledges:

"It was in the province of the jury to consider whether the failure to sound the horn was in any way causal of the collision. . . ."

We think it follows from this and all the facts of record that there was a jury question in respect to whether Westfall's failure contributed to the creation of the emergency. Hence, the emergency instruction should have been given.

Whether Westfall was to be exculpated from improper management and control—by reason of his failure to timely apply the brake or his failure to direct his cycle in such a way as to avoid the accident—were also questions to be decided by the jury after a proper emergency instruction. Because we conclude the emergency instruction should have been given to the jury, we conclude that the omission of the instruction was reversible error. The jury in this case could have reached the conclusion that

the plaintiff was negligent solely on the basis of the fact that the plaintiff's action was inappropriate, *i.e.*, negligent as to management and control, in the face of an emergency when due consideration of the exonerating aspects of the emergency doctrine might have relieved him of that responsibility. *See, McCrossen v. Nekoosa-Edwards Paper Co.*, 59 Wis. 2d 245, 258, 208 N.W.2d 148 (1973). It was for the jury to determine whether Westfall, who asked for the instruction, was causally negligent *prior* to the emergency and thus contributed to it.

Other facts are also alluded to which the defendant relies upon to show that the plaintiff was negligent prior to the accident.

Considerable emphasis is placed upon the fact that Westfall was only fourteen and an unlicensed driver. The trial court appeared to place substantial reliance on the fact of Westfall's extreme youth and that he did not have a license to operate a motorcycle. The court of appeals properly concluded that it was erroneous to base negligence upon these factors, which are unrelated to the actual conduct of the person inquired about. The fact plaintiff Westfall was unlicensed did not constitute a cause of the accident. It was erroneous to instruct the jury that either the age of the operator or that he was unlicensed were factors to be considered in determining whether he was negligent. In the context of this case we conclude, as did the court of appeals, the instruction to be erroneous; but in addition we conclude the instruction was prejudicial. Particularly, we deem it to be so when coupled with the instruction that the law did not permit a person of Westfall's experience to carry a passenger. That instruction could be appropriate where negligence in respect to a passenger is at issue. The underlying statute (sec. 343.07 (4) (b) 1, Stats.) is a safety statute, whose purpose is to protect passengers. It is irrelevant

in respect to a party not a passenger, and its injection into the case as another element of negligence is prejudicial.

There was also an instruction that the Wisconsin statutes require a driver of a motorcycle to wear eye protection or to be protected by a cycle windshield of a minimum size. Westfall did not wear eye protection and the cycle did not conform to the statutory specifications. It was error to give the instruction because there was no evidence whatsoever that the failure to have eye protection was in any way causal in respect to this accident. The testimony was unmistakable that Westfall did see, and did see clearly, the Kottke tractor ahead of him. There is no intimation that he did not react instantly when Kottke made his turn. The negligence charged is not that he did not see but that he acted negligently in respect to management and control upon perceiving the turn of Kottke's tractor across his passing lane. It is prejudicial error to instruct upon an element of negligence when there is nothing in the record which would tend to show that act of negligence contributed to the accident. *Carlson v. Drews of Hales Corners, Inc.*, 48 Wis. 2d 408, 414, 180 N.W.2d 546 (1970). Although the violation of the statute may in a proper circumstance be negligence *per se,* breach of the statute can create no liability unless it caused the accident. Accordingly, an instruction in respect to the violation of a safety statute should not be given unless the jury, on the basis of evidence of record, could have found the violation was causal. Such evidence was totally missing here. Evidence which merely tended to show that absence of eye protection could cause defective vision in some circumstances was not sufficient to permit the instruction to be used in this case, where the evidence was that faulty vision of Westfall was not involved. The instruction was erroneous and prejudicial.

Westfall also made timely objection to the following instruction:

"The driver of the front car owes no duty to the driver of the car behind him except to use the road in the usual way, in keeping with the laws of the road, and until he has been made aware of the car behind by signal or otherwise, he has a right to assume either that there is no other automobile in close proximity to his rear or that being there, it is under such control as not to interfere with his lawful use of the road."

On its face this instruction is erroneous in the instant case, for it clearly refers to the usual progression of a vehicle upon a highway with no deviation from its course. It is irrelevant to the duty of a driver of a front vehicle, such as Kottke's tractor, when he turns from a straight-ahead course. This instruction has recently been revised by the addition of an introductory sentence which states that it is inapplicable when the driver deviates from his lane of travel. *See, Bentzler v. Braun,* 34 Wis. 2d 362, 149 N.W.2d 626 (1967), and Comments to 1981 Revision, Wis. JI—Civil 1114. Hence, the use of the instruction here is irrelevant and consequently erroneous.

The mere fact it is erroneous does not, *ipso facto,* make it prejudicial. We adhere to the rule that jury instructions should be considered as a whole, and the test of prejudice is whether there is a probability that the jury will be misled by an erroneous instruction. *Kuhlman, Inc. v. G. Heileman Brewing Co., Inc.,* 83 Wis. 2d 749, 756, 266 N.W.2d 382 (1978) ; *Chart v. General Motors Corp.,* 80 Wis. 2d 91, 105, 258 N.W.2d 680 (1977).

In the course of the instructions, the court did, however, instruct the jury that:

". . . no person shall turn into a private road or driveway unless and until such movement can be made with reasonable safety."

Defendant claims this instruction clarified any doubt or misconception about the lead driver's duty in respect to a following vehicle.

The court also instructed the jury that the driver of the turning vehicle must make an efficient lookout:

"This calls for him to exercise ordinary care to determine the presence, location, distance, and speed of any vehicle that might be affected by his movement. After having made these observations, the driver must also exercise reasonable judgment in calculating the time required for him to safely complete his turn without interfering with other vehicles within or approaching his course of travel."

One question posed by this instruction is on what safety statute it is based. It would appear that, for the circumstances here, an instruction based upon sec. 346.13 (1), Stats., would be more appropriate than the generalized instruction given. Sec. 346.13(1) gives rise to instruction Wis JI—Civil 1355, which provided that a driver:

". . . shall not deviate from the traffic lane in which he is driving without first ascertaining that such movement can be made with safety to other vehicles approaching from the rear.

"The driver of the deviating vehicle is required to exercise ordinary care to make an efficient lookout. . . ."

It is clear that this instruction, an instruction not given here, specifically requires a lookout to the rear, for it then goes on to tell the jury that the driver must *also* exercise reasonable judgment in respect to other vehicles in or approaching his course of travel. Such an instruction or a similar one would have clarified the erroneous impression of the first instruction.

But the instruction which the defendant claims to have clarified the erroneous instruction left the impression that there was no duty of lookout to the rear. Instead of

clarifying the earlier instruction, the latter instruction compounds the error, for it was not the instruction appropriate to the duty in respect to following vehicles or vehicles to the rear. The first instruction left the distinct impression that no duty whatsoever rested upon the lead vehicle in respect to following vehicles even if there were a deviation. The instruction given was only peripherally relevant to the emergency that arose between Kottke and Westfall. The instruction that stated there was no duty to a car to the rear specifically applied to the situation faced by the jury, but was erroneous because it had no application when the lead vehicle deviates from its path of travel. The specific error of the first instruction was not corrected by the only vaguely applicable second instruction, that defendant claims to be curative. The error was not rectified; and even when the instructions are viewed as a whole, this instruction is erroneous and prejudicial.

There was also a general instruction which told the jury that it was the duty of every motor vehicle operator to keep a lookout to the rear "if occasion requires." While this is correct, it was given as a general instruction applicable to both drivers. In respect to Westfall, it was irrelevant; and in respect to Kottke, to whom it was relevant, it was an undefined duty, for it left without definition under what circumstances a lookout to the rear would be required.

A more appropriate legal standard as applied to Kottke appears in *Jacobson v. Greyhound Corp.*, 29 Wis. 2d 55, 138 N.W.2d 133 (1965), wherein we said:

". . . a driver ordinarily has no duty of maintaining a lookout to the rear unless a deviation from his course of travel or his position on the highway could reasonably create or constitute a hazard to drivers approaching from the rear." P. 65.

We conclude that it was also error to refuse to give the "plain sight" instruction, Wis. JI—Civil 1070:

"One charged with the duty of maintaining a lookout must look with such attention and care as to see what is in plain sight. If he looks and does not see what is in plain sight, he will not be heard to say that he maintained a proper lookout, and he is just as negligent as if he did not look at all.

"The duty to look means to look efficiently. One who looks and fails to see what is in plain sight is in precisely the position he would be in if he did not look at all."

It is the law that one who looks and fails to see what is in plain sight is as negligent as to lookout as one who has not looked at all. *Weber v. Mayer*, 266 Wis. 241, 258, 63 N.W.2d 318 (1954); *Grutzner v. Kruse*, 87 Wis. 2d 38, 273 N.W.2d 373 (CA 1978); *Leckwee v. Gibson*, 90 Wis. 2d 275, 280 N.W.2d 186 (1979).

Here the facts undisputedly show that Kottke claims to have made an observation on three occasions shortly before the accident. Yet he saw the motorcycle only as it hit his tractor. Under these facts, where the cycle was in plain view from one in Kottke's position, to look and not see it was negligence. Yet it appears to be Kottke's testimony that he did keep a proper lookout. In these circumstances it was imperative to tell the jury that to look and not see what is in plain sight is tantamount to not looking at all.

A reasonable jury properly instructed could have concluded that Kottke failed to see the motorcycle and accordingly made the turn in the face of what should have been an apparent danger. A reasonable jury properly instructed could hardly have failed to conclude that Kottke's negligent lookout was a major cause of the accident; yet the jury found that Kottke was guilty of no causal negligence. The trial court in its decision on motions

after verdict justifies the failure to give the plain sight instruction because the jury, even without it, found negligence. No doubt, the instruction that was given could advise an attentive and intelligent juror that to require "seasonable and effective use of a driver's sense" means that to look and not see what is in plain sight is negligence. But it also might mean, in the absence of the plain sight instruction so relevant here, that just looking discharged some duty and, hence, could not be very negligent. There is no doubt that Kottke's untimely turn without an effective observation to the rear was a cause of the accident. Yet the jury found that negligence to be only 10 percent and not causal. It seems rather clear that the jury could not have been properly apprised of the significance of the failure to see what was in plain sight. We deem the failure to instruct on "plain sight" to be aggravated by the earlier erroneous instruction that a lead driver "owes no duty to the driver of the car behind him . . . ." The error was prejudicial.

A principal point urged by the plaintiff on this review is that the damages were so shockingly low as to show perversity and that, even in the absence of other errors, a new trial should be ordered on all issues. Because we find numerous other prejudicial errors meriting reversal and a new trial, this is not an appropriate case to order a new trial on all issues on the single ground that the inadequacy of damages shocks the conscience of the court. It does appear, however, that the jury flouted the court's instructions in respect to damages for future loss of earnings. There was evidence which could, if believed, have supported an award in excess of $300,000. Yet the jury awarded zero. Some substantial amount was clearly appropriate under the evidence.

The record is clear that this young man sustained excruciating pain for a substantial period of time and will have pain for the rest of his life. It is also undisputed

that he bears disfiguring and hideous scars over a large portion of his lower body. One leg is shorter by one and one-half inches than the other. He walks with a pronounced limp. Eventually he will require a hip replacement and probably other surgical procedures. His prognosis for the future is disabling and painful arthritis. Yet the jury awarded only $10,000 for all pain and suffering—past and future. In view of the undisputed facts, the award is shockingly low and does not reflect the jury's attention to the court's instruction that the award for pain and suffering should reasonably compensate the plaintiff for:

". . . disfigurement, and such impairment of his mental and bodily health, physical abilities and bodily functions . . . humiliation, embarrassment, worry and mental distress . . . impair[ment of] ability to enjoy the normal activities, pleasures and benefits of life."

The jury was instructed that Clark Westfall at the time of trial was seventeen years of age, that he had a life expectancy of fifty-three years, and that future damages were to be calculated in light of that life expectancy. Yet the jury returned a verdict of only $10,000 —a figure that cannot be justified in light of undisputed facts of record.

Upon remand there shall be a new trial upon all issues including damages.

Additionally, plaintiff complains of the incompleteness of the instruction given in respect to whether Walter Kottke was the "servant" of the owner of the tractor, Wayne Kottke, his son.

The instruction provided:

"Evidence has been received that Wayne Kottke was the owner of the farm tractor driven by Walter Kottke. The law provides that from this fact a presumption arises that the driver was the servant of the owner.

Other evidence has been introduced however, from which you may infer that Walter Kottke was not the servant of the owner."

Plaintiff requested the following sentence, the last sentence of Wis. JI—Civil 1600, to appear immediately at the end of this instruction:

"Unless you are satisfied to a reasonable certainty by the greater weight of the credible evidence that it is more probable that the driver was not the servant of the owner, you must find that the driver was the servant of the owner."

This portion of the instruction was refused. On appeal the court of appeals did not hold that the requested sentence was not appropriate. Rather, it said that omission of the requested instruction was cured because:

"The jury was instructed, however, that because Wayne Kottke was the owner of the tractor driven by Walter Kottke, a presumption arose that Walter was Wayne's servant. Based upon this instruction, we conclude that the deletion of the last sentence of Wis. JI—Civil 1600 was not prejudicial."

We disagree. A lay jury could not be expected to understand the effect of the presumption without further explanation. The general presumption instruction, Wis. JI—Civil 350, includes the explanation which the trial court refused to give in this case. Because the jury is required to weigh the effect of the presumption as contrasted to evidence to the contrary, we conclude that it was error to fail to give the explanatory language requested. We are satisfied that the final sentence, which made clear that the burden of overcoming the presumption of the master-servant relationship was on the party denying the relationship, was necessary to the jury's understanding of the question. The instruction as given was inadequate and erroneous.

Plaintiff argues also that the rejection of his proffered instruction in respect to circumstantial evidence was prejudicial. He is concerned with the fact that the statutes require a lit headlight on a motorcycle at all times. Westfall was unable to testify to that fact, because he was operating the cycle in the daytime and was unable to see whether the light was on. He did present evidence that the light went on whenever the engine was started and, hence, the fact that the bike was operating constituted circumstantial proof that the safety statute's requirement was fulfilled. His request for a circumstantial evidence instruction (Wis. JI—Civil 230) was refused.

We see no prejudicial error in that refusal. There is no reason why he could not, from the facts, argue that the light was on, more likely than not, whenever the bike was in operation. There was, however, evidence that the front of the bike had been damaged in a collision a short time earlier. Hence, the circumstances that the plaintiff argued for, that the light was on whenever the engine was on, is subject to differing conclusions. At any rate, we do not see the omission of the instruction as prejudicial to the plaintiff.

The record reveals that Kottke did not see the cycle when it was in plain sight. It is difficult to imagine that the failure to have a lit headlight when an accident occurs on a bright sunlit day has anything to do with the cause of the accident when the motorcycle itself was not seen despite three alleged observations. The propriety of the circumstantial evidence instruction is doubtful, and its omission could not have harmed the plaintiff. Moreover, it would appear that, under the circumstances here, where whether or not the headlight was on had nothing to do with the cause of the accident, that instruction in respect to the safety statute requiring lights was in itself improper.

We conclude that this record shows a trial replete with prejudicial error, a verdict that is inconsistent, and a damage award that is in part shockingly inadequate. We reverse the decision of the court of appeals and direct that upon remand a new trial be afforded the parties.

*By the Court.*—Decision reversed and cause remanded.

BEILFUSS, C.J., took no part.

SHIRLEY S. ABRAHAMSON, J. *(concurring)*. As I understand the majority opinion, if the jury brings in an inconsistent verdict, the trial court should reinstruct the jury and give the jury the opportunity to reconsider its action. Nevertheless, the majority opinion apparently empowers the trial court, in the event of an inconsistent verdict, to enter judgment without reinstructing the jury or giving it an opportunity to reconsider its action if the appropriate party waives any claims arising out of the inconsistent verdict (*supra,* pp. 99–101) or the trial court, pursuant to sec. 805.14(5)(d), Stats. 1979–80, reserved a ruling on a motion for directed verdict or dismissal prior to submission of the verdict to a jury (*supra,* pp. 100, 101). If after reinstruction the jury brings in an inconsistent verdict, the majority holds that there must be a new trial unless the appropriate party waives any claims arising out of the inconsistent verdict (*supra,* pp. 99–101), or the trial court, pursuant to sec. 805.14(5)(d), Stats. 1979–80, reserved a ruling on a motion for directed verdict or dismissal made prior to the initial submission of the verdict to a jury (*supra,* pp. 100, 101).

Under the majority opinion, if after reinstruction the jury brings in an inconsistent verdict and there is no waiver of claims and there has been no reservation of a ruling under sec. 805.14(5)(d) and a party, pursuant

to sec. 805.14(5)(c), (e), Stats. 1979–80, "moves the court to change an answer in the verdict on the ground of insufficiency of the evidence to sustain the answer," then the trial court cannot change the answer but must grant a new trial. I disagree with this aspect of the opinion. Since sec. 805.14(5)(c), (e) and sec. 805.14(5)(d) are so similar,* in the event of an inconsistent verdict after reinstruction, I would permit the trial court to exercise its power to change an answer pursuant to sec. 805.14(5)(c), (e) and (6).

---

* "The Wisconsin court has recommended that a trial court reserve its ruling on a motion for directed verdict until after the jury has returned its verdict in order to eliminate the necessity of granting a new trial. Accordingly, subsection (5)(d) expressly provides for a renewal of the motion after verdict.

"Subsection (5)(e) abolishes the necessity of preliminary motions as prerequisites for the making of motions for judgment notwithstanding the verdict or to change answer. . . . The state rule recognizes that the practice of taking pre-submission motions under advisement pending the return of the verdict is so common in modern litigation that the preliminary motions frequently serve no purpose other than laying the formal basis for the motions to be made after verdict." Graczyk, *The New Wisconsin Rules of Civil Procedure, Chapters 805–807*, 59 Marq. L. Rev. 671, 706, 707 (1976) (footnotes omitted).