488 N.W.2d 567 (1992)
241 Neb. 467
Donald D. TUREK, Appellant,
v.
SAINT ELIZABETH COMMUNITY HEALTH CENTER, a Nebraska Corporation, et al., Appellees.
No. S-89-1223.
Supreme Court of Nebraska.
September 11, 1992.
*569 Donald E. Earnshaw, Omaha, for appellant.
Mark A. Christensen, of Cline, Williams, Wright, Johnson & Oldfather, Lincoln, for appellee Saint Elizabeth Community Health Center.
Daniel P. Chesire, of Kennedy, Holland, DeLacy & Svoboda, Omaha, for appellee Robert Gillespie.
James A. Snowden and Shirley K. Williams, of Knudsen, Berkheimer, Richardson & Endacott, Lincoln, for appellee Pat Burgher Gillespie.
BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
BOSLAUGH, Justice.
The plaintiff, Donald D. Turek, has appealed from the order of the trial court granting the defendants' motions for summary judgment and dismissing the plaintiff's cause of action with prejudice. The defendants are Saint Elizabeth Community Health Center; Robert Gillespie, M.D.; and Pat Burgher Gillespie, a registered nurse.
The plaintiff, who was born August 18, 1966, was admitted to the St. Elizabeth burn treatment unit on October 26, 1978, with second and third degree burns over 58 to 68 percent of his body. He remained in that hospital through March 31, 1979. While he was a patient at St. Elizabeth, the plaintiff was under the care of defendant Dr. Gillespie and was also treated by defendant Nurse Gillespie. The plaintiff alleges that during the course of his treatment at St. Elizabeth, Nurse Gillespie performed certain procedures upon him which were beyond the scope of her training and authority as a registered nurse. These procedures included the insertion of a catheter into his subclavian artery, the administration of an anesthetic, and the use of a dermatome to perform skin grafting.
The plaintiff also alleges that Dr. Gillespie and Nurse Gillespie directed a staff member to conceal records which would have indicated that nurses at St. Elizabeth burn unit were performing procedures which were beyond the scope of their training and authority and that as a result, these records were not available for inspection *570 by the Joint Commission on Accreditation of Hospitals.
In the third amended petition, which was filed on May 10, 1988, the plaintiff alleged that he had been injured by the negligence of the defendants, and he affirmatively waived his right for review by the medical review panel as provided in Neb.Rev.Stat. § 44-2840(4) (Reissue 1988). The plaintiff does not claim a battery as a basis for recovery of damages.
The defendants' motions for summary judgment are not included in the transcript, but are described in the judgment of the trial court. Apparently, the motions were heard upon the pleadings consisting of the third amended petition, the separate answers of the defendants, the motions, the deposition of the plaintiff offered by the defendants, and an affidavit of Bertine Loop, a certified master social worker, which affidavit was offered by the plaintiff. The plaintiff offered no other evidence in resistance to the motions.
The third amended petition alleged that Nurse Gillespie was negligent in that she performed medical procedures which she was not licensed to perform and that Dr. Gillespie and St. Elizabeth were negligent in allowing her to perform these procedures. The plaintiff further alleged that the defendants were negligent in failing to inform him that Nurse Gillespie was not licensed to perform surgical procedures and that the defendants were negligent in failing to obtain his informed consent prior to performing the surgical procedures.
Although the plaintiff did not allege directly that he was injured as a result of the procedures which Nurse Gillespie performed, he did allege that when, in 1986, he discovered that Nurse Gillespie was unlicensed to perform such procedures, he "was upset that his treatment time could have been extended and his life endangered" and that as a result, he "sustained headaches, vomiting, sleeplessness, fear, severe emotional distress, and will be required to seek psychiatric care." (Emphasis supplied.)
The trial court found that the plaintiff had failed to allege any negligent conduct on the part of the defendants because there is no claim that the treatment of the plaintiff did not comply with the standards of care applicable to the plaintiff; that the alleged lack of informed consent could not be a basis for recovery because none of the risks inherent to the treatment materialized or came to fruition; that the conduct of the defendants was not outrageous or beyond the bounds of decency, nor was it atrocious or intolerable in a civilized community; that any emotional harm suffered by the plaintiff was not of such a character that it could be said to be in excess of that which a reasonable person should be expected to endure; and that the fear and apprehension allegedly suffered by the plaintiff were not the proximate result of any act or omission of the defendants'. The plaintiff's assignments of error are directed at the findings of the trial court.
A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted. After the moving party has shown facts entitling it to a judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law for the moving party. Western Sec. Bank v. Terry A. Lambert Plumbing, 240 Neb. 448, 482 N.W.2d 278 (1992).
In reviewing an order sustaining a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences that may be deduced from the evidence. Id.
All of the plaintiff's allegations of negligence are based on the theory that the fact that Nurse Gillespie was not licensed or trained to perform surgical procedures was sufficient to prove negligence. The plaintiff has cited no authority in support *571 of his contention, and the cases which have considered the matter hold to the contrary.
In Leahy v. Kenosha Memorial Hospital, 118 Wis.2d 441, 348 N.W.2d 607 (App. 1984), the plaintiff sought damages for a brain injury to an infant alleged to have been caused by the actions of the treating physician and the hospital shortly after the birth of the infant. A part of the plaintiff's evidence related to a claim that the persons caring for the infant were not registered nurses. The trial court had instructed the jury that a violation of the statute regulating the practice of professional nursing was negligence. In holding the instruction was erroneous and reversing the judgment for the plaintiff, the court said:
The court addressed the matter of negligence in the instructions by first delivering Wis J ICivil 1005. The trial court then proceeded to give the optional concluding paragraph to the standard instruction as follows: "In addition to this general definition of negligence, there are other safety statutes enacted by the legislature, a violation of which is negligence as that term is used in the verdict and these instructions. [Emphasis added.]"
This language alerts any reasonably informed juror that the hospital's negligence can be measured not only from the general definition already given but also from a finding of a violation of a statute.
The court then delivered the statutory definitions of professional nursing and practical nursing. The court following these definitions with this language: "If you find by virtue of this statute that the Kenosha Memorial Hospital placed practical nurses or technicians in positions where they could not legally function, in positions that should have been staffed by professional registered nurses, or if the Kenosha Memorial Hospital permitted practical nurses to function as professional registered nurses, then the Kenosha Memorial Hospital would be negligent as that term has been defined for you. [Emphasis added.]"
The trial court concluded the negligence phase of the instructions with Wis J ICivil 1023.7 (with certain modifications) upon which a further finding of negligence against the hospital, unrelated to any statute, could be premised.
A fair reading of the entire negligence instructions and the context within which they were delivered reveals that alternative grounds for a finding of negligence against the hospital were presented to the jury, including language which informed the jury that a violation of sec. 441.11, Stats., could form the basis for such a finding. This constituted a negligence per se instruction.
.... As already noted, the purpose of ch. 441, Stats., is to regulate the nursing profession through the creation of a board of nursing and to provide for the licensing of nurses. While these laws result in securing the safety and welfare of the public as an entity, nothing in ch. 441, directly or by implication, reveals a legislative intent to grant a private right of action for a violation of the statute. Dean Prosser has stated that: "Most licensing statutes, such as those applicable to automobile drivers or physicians, have been construed as intended only for the protection of the public against injury at the hands of incompetents, and to create no liability where the actor is in fact competent but unlicensed." W. Prosser, Handbook of the Law of Torts § 36 at 196 (4th ed. 1971). Wisconsin followed the Prosser rule in Westfall v. Kottke, 110 Wis.2d 86, 328 N.W.2d 481 (1983). The trial court in Westfall instructed the jury that they could consider the absence of a license on the issue of negligence. In holding that the trial court's instruction was erroneous, the supreme court said: "Considerable emphasis is placed upon the fact that Westfall was only fourteen and an unlicensed driver. The trial court appeared to place substantial reliance on the fact of Westfall's extreme youth and that he did not have a license to operate a motorcycle. The court of appeals properly concluded that it was erroneous to base negligence upon these *572 factors, which are unrelated to the actual conduct of the person inquired about. The fact plaintiff Westfall was unlicensed did not constitute a cause of the accident. It was erroneous to instruct the jury that either the age of the operator or that he was unlicensed were factors to be considered in determining whether he was negligent. [Emphasis added.]" Id. at 105, 328 N.W.2d at 491. The negligence per se instruction in the instant case created the same problem as that in Westfall in that it highlighted to the jury the question of whether the nurses' conduct fell within the concept of professional nursing or practical nursing under the statute and effectively prohibited consideration of the quality and competency of such conduct.
We conclude that sec. 441.11, Stats., is not a safety statute and does not grant a private right of action for its violation. The trial court's negligence per se instruction based on sec. 441.11 was therefore erroneous.
Leahy v. Kenosha Memorial Hospital, 118 Wis.2d at 447-48, 450-51, 348 N.W.2d at 611-13.
In Fjerstad v. Knutson, 271 N.W.2d 8 (S.D.1978), the plaintiff alleged the death of the decedent had resulted from negligent treatment by the hospital and an intern. Upon appeal the plaintiff claimed that the trial court had erred in refusing to instruct that violation of the licensure laws was negligence as a matter of law. In holding that the plaintiff could not base a claim of negligence upon a violation of the licensure laws, the court said:
Aside from the intern requirement, we do not believe that failure to have a license should, in itself, render the unlicensed person negligent. A physician is negligent if his treatment is improper, but failure to have a license is not enough to render the treatment automatically deficient. See Tittle v. Hurlbutt, 53 Haw. 526, 497 P.2d 1354 (1972); Janssen v. Mulder, 232 Mich. 183, 205 N.W. 159 (1925) (chiropractor); Prosser, Law of Torts 196 (4th ed. 1971). The same is true on the issue of the intern being called "Doctor". Although doing so may be a misdemeanor, it does not render Knutson's treatment negligent per se.
The second contention is that Sioux Valley Hospital was negligent per se because it was practicing medicine through its unlicensed intern. We conclude that this contention is likewise without merit. According to SDCL 36-4-11, the intern must serve his internship in a hospital. Also, the fact that a hospital violates these licensure statutes does not in itself render the hospital negligent.
... The instruction involved allows Knutson to escape liability only if he made an error in judgment while performing according to the standard of care for licensed physicians in similar localities. As we noted above, the lack of a license, without more, does not render his conduct negligent. An error in judgment within the standard of care for licensed physicians would likewise not render the medical treatment negligent.
Fjerstad v. Knutson, 271 N.W.2d at 14.
In DeHart v. Board of Podiatry, 97 Mich.App. 307, 293 N.W.2d 806 (1980), the issue was whether a podiatrist's license should be revoked because he had unlawfully invaded the field of medicine. In holding that the actions of the podiatrist should be judged by the standards of practice for licensed doctors of medicine, the court stated:
When one practices a healing arts profession for which he holds no license, he is required to adhere to the standards of practice of those who are properly licensed. Thus, in the instant case, since the plaintiff unlawfully invaded the field of medicine, his actions were properly judged by the standards of practice for licensed doctors of medicine. Id. at 313, 293 N.W.2d at 809.
In the case at bar, the plaintiff does not contend that his treatment by the defendants was improper in any way except that Nurse Gillespie was not licensed to perform the things that she did which amounted to the practice of medicine. Thus, the plaintiff failed to allege any negligence on the part of the defendants.
*573 The plaintiff could not recover upon the basis of lack of informed consent because none of the risks inherent to the treatment or procedures came to fruition, and the plaintiff does not claim otherwise. Expert testimony is required to prove the standard of care in an informed consent case, and the plaintiff has no such evidence. See, Jones v. Malloy, 226 Neb. 559, 412 N.W.2d 837 (1987); Kohoutek v. Hafner, 383 N.W.2d 295 (Minn.1986); Wheeldon v. Madison, 374 N.W.2d 367 (S.D. 1985).
The plaintiff claims that he suffered headaches, sleeplessness, vomiting, and severe emotional distress as a result of the conduct of the defendants. All of these are medical conditions, but he has no expert medical opinion evidence that all or any of these matters were caused by the defendants.
Where the character of an alleged injury is not objective, the cause and extent of the injury must be established by expert medical testimony. Binkerd v. Central Transportation Co., 236 Neb. 350, 461 N.W.2d 87 (1990). Where physical injury, upon which a claim for emotional distress is based, is not obvious to laymen, its existence may not be demonstrated solely by complaints of the alleged victim, but must also be substantiated by expert medical testimony. Anderson v. W.R. Grace & Co., 628 F.Supp. 1219 (D.Mass.1986).
The affidavit of Loop, which was the only evidence offered by the plaintiff in resistance to the defendants' motions, was not admissible as evidence of proximate cause. Loop is a certified master social worker who has provided counseling services to the plaintiff. Loop, however, is not competent to express an opinion on medical questions or testify as to the cause of the medical conditions which the plaintiff claims he sustained as a result of the defendants' treatment of the plaintiff.
With respect to proximate cause generally, the plaintiff must establish that his alleged damages were the natural and probable result of the alleged negligence of the defendant.
Proximate cause is that cause which, in a natural and continuous sequence, unaccompanied by any efficient intervening cause, produces the injury, and without which the result would not have occurred. Belgum v. Mitsuo Kawamoto & Assoc., 236 Neb. 127, 459 N.W.2d 226 (1990). However, it is not sufficient that the negligence charged furnishes only a condition by which the injury is made possible, for if such condition causes an injury by the subsequent independent act of a third person, the two acts are not concurrent and the existence of the conditions is not the proximate cause of the injury. C.S. v. Sophir, 220 Neb. 51, 368 N.W.2d 444 (1985); Steenbock v. Omaha Country Club, 110 Neb. 794, 195 N.W. 117 (1923).
Furthermore,
"`An injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it, but for the interposition of some new, independent cause that could not have been anticipated.'"
Lock v. Packard Flying Service, Inc., 185 Neb. 71, 75, 173 N.W.2d 516, 519 (1970), quoting Kroeger v. Safranek, 161 Neb. 182, 72 N.W.2d 831 (1955).
Here there was a lapse of some 7 or 8 years before the plaintiff's complaints originated.
In his deposition the plaintiff testified that his emotional distress initially arose in October 1986 while he was working at a radio station in Beatrice. At that time, he read an item on the newsroom wire which indicated that the Nebraska Department of Health was investigating the possibility of nurses' performing procedures beyond the scope of nursing in the St. Elizabeth burn unit. Although the plaintiff did know that Nurse Gillespie had performed a subclavian catheterization and skin grafting upon him 7 to 8 years earlier during the time in which he was hospitalized, he was not aware that she was unlicensed to perform these procedures until he learned of the State's investigation.
*574 After reading the wire story and additional newspaper particles concerning the investigation, the plaintiff discussed the allegations with his mother, and he eventually contacted the State concerning the surgical procedures which Nurse Gillespie had performed upon him. According to the plaintiff, he was somewhat reluctant to contact the State because recounting his experience "was going to be reliving it all again," but it was something he "just had to do." However, the plaintiff apparently does not have an aversion to any reminder of his experience as a burn victim, as he expresses an interest in becoming involved in counseling other burn victims. The plaintiff also testified that he does not mind discussing his experience as a burn patient.
The plaintiff testified that initially learning of the State's investigation of the St. Elizabeth burn unit was "nothing major at that time," but stated that acquiring that knowledge "was like the detonator, and then [his emotional distress] slowly just kind of built." When asked if he was angered by the newspaper accounts of the State's investigation, Turek testified:
I don't know if angry was the word. I think justI think more astonished is the word. Toand then as, you know, the further and further, you know, the more time that went on, and I was able to just think about the procedures that were done, and what happened, and really how vulnerable I was, and it just got that much worse. And I was kind of upset, you know, I was upset, but I was more just astonished that these things had happened.
After becoming aware of the State's investigation in October 1986, the plaintiff investigated the potential risks inherent in the procedures which Nurse Gillespie had performed, particularly those risks associated with the insertion of a catheter into his subclavian artery. The knowledge of those risks enhanced his emotional distress, and he experienced "nausea and all of those things," which he described as a "queasy feeling ... the feeling of reliving the whole thing again."
The plaintiff testified that more than 1 year later, in November 1987, he experienced vomiting, diarrhea, and a loss of appetite for a period of 2 months, which he attributes to the stress associated with his learning of the investigation of the St. Elizabeth burn unit. At his mother's urging, he did contact a doctor with respect to this physical illness, but testified that "it was more of a matter of just overcoming my anxiety and my stress in dealing with it and getting on again." Despite this self-diagnosis, Turek testified that no physician ever told him that his intestinal illness was due to his contemplation of the investigation of the St. Elizabeth burn unit, and this illness remains medically undiagnosed. Nevertheless, according to the plaintiff, "I diagnosed it when if first happened. It was nerves."
While the plaintiff attributes his emotional distress to his learning that Nurse Gillespie had performed procedures upon him for which she was not licensed, his testimony reveals that he became most disturbed when he learned that the State had dropped its investigation of the St. Elizabeth burn unit. Apparently referring to Nurse Gillespie and Dr. Gillespie, Turek described his reaction when he learned of the termination of the State's investigation:
It made me very angry.... They gave her a fine, which is next to nothing, to, you know, $2,000.... And to give her a raise and let her investigate the scope of nursing practices, and then dismiss everything against Gillespie, and then it was just shoved aside.... Well, it can't be shoved aside. These are real people you're dealing with here. I mean, you'reyou can't keep bringing them in and shoving them out like they're hams.... You've got to have some compassion for those patients. And just try and relate with them.
According to the plaintiff, before the charges were dropped he "had experienced nausea and all of those things.... But after the charges were dropped, that's when the real, the diarrhea and the vomiting and all this came." When asked if the discontinuation of the State's investigation *575 of the St. Elizabeth burn unit caused his vomiting and diarrhea, the plaintiff stated:
I think thatI think that was a part of it. I think just the fact that it was eliminated without virtually any body taking any responsibility for what was done, I think, is what upset me more than anything. And that, I think that's basically what upset me more than anything.
The plaintiff also testified that while the State's investigation triggered memories of his experience in the St. Elizabeth burn unit, "the big thing was when it just was dismissed. That was just like the icing on top of the cake, so to speak. It just leveled me. I couldn't believe it."
In May 1988, the plaintiff met with Dr. Stan Moore, a psychologist, to discuss why he "was having so many anxieties." Although Dr. Moore suggested further counseling, the plaintiff was not aware of any diagnosis which Dr. Moore may have made regarding his condition.
At the time of his deposition, the plaintiff was meeting on a weekly basis with Loop, the certified master social worker. The plaintiff began meeting with Loop 2 to 3 months after he had met with Dr. Moore, and he described his meetings with Loop:
Basically just, she just sits there and listens to me ramble. I tell her about what's going on in my life.... But really a lot of it, you know, is just dealing with my feelings of mistrust and trying to get those out.
And basically right now it's just one of those things where I talk and she listens. And she doesn't ask a lot of questions.
....
... I think it's kind of helpful in a way.... Bertine's father died in the burn unit. And that's really the only way I can relate with her, and talk to her. It's kind of nice to be able to talk to somebody who's been there.
....
... Right now it's ... more of a self-actualization type thing for me [to get to] know myself better.
While the plaintiff claims that the defendants' alleged negligence caused his alleged emotional distress which commenced in 1986, it is noteworthy that another unrelated incident apparently also created stress for the plaintiff that year. In November 1986, the plaintiff and a friend wrote what the plaintiff describes as "a song about a guy sitting in a room by himself looking back on the world right before he commits suicide." According to the plaintiff, "we wrote the song and played it for a buddy of [his], he was the first one to hear it; and he committed suicide a few weeks later."
When asked if this incident was as stressful as reading about Nurse Gillespie and the doctors at St. Elizabeth, the plaintiff replied: "Similar, but not the same. I mean, both instances you ask why, you know. But I guess there aren't any answers."
In describing the damages which he alleges he has suffered, the plaintiff testified that as a result of the defendants' alleged negligence, he is inflicted with profound distrust, particularly with respect to the medical profession. He testified:
[Nurse Gillespie] basically put my life in a situation, you know, very life-threatening situation that I do not need to be in. And she did surgery on me without consulting my parents, she did surgery on me without signing a release, and I don't know why she did it. I think she just did it on a whim. I can't tell you why.
But because these things have happened, I don't just don't trust, I just don't trust doctors, I don't trust nurses, I don't trust anybody involved. And when I get sick I don't go anywhere, I just sit and I deal with it. I lay on my couch.
And I'm really scared to death some day I'm going to be sitting on my couch some day, just sitting, and I may be bleeding internally or something, and I just wouldn't go to the doctor or the hospital to be treated, because I don't think they know, I don't think that they're going to take care of me in the proper way....
*576 However, the plaintiff does not limit his distrust to the medical profession. When asked if there are other people he does not trust, the plaintiff replied: "I don't like to rely on anybody else for anything." But, the plaintiff testified that among those he does not trust, the medical profession is "at the top of the list."
In the present case, it is clear that prior to the time that the Department of Health dropped its investigation of the St. Elizabeth burn unit, the plaintiff, as a matter of law, did not suffer any compensable damages. While the plaintiff testified that he was "astonished" to learn that Nurse Gillespie had not been licensed to perform the procedures which she had performed, he also testified that acquiring that knowledge was "nothing major at that time." Later, his emotional distress "slowly just kind of built," and he experienced a "queasy feeling ... the feeling of reliving the whole thing again." It may be understandable that initially learning of the investigation of the St. Elizabeth burn unit would cause the plaintiff some mental anguish by serving as a reminder of the suffering he had experienced while undergoing recovery from the severe burns he had received, just as any event which served as a reminder of that experience might provoke some anguish. However, in order for Turek's emotional distress to be compensable, it must be severe. See, Hassing v. Wortman, 214 Neb. 154, 333 N.W.2d 765 (1983); Pick v. Fordyce Co-op Credit Assn., 225 Neb. 714, 408 N.W.2d 248 (1987).
While Hassing and Pick were cases involving alleged intentional, as opposed to negligent, infliction of emotional distress, other jurisdictions have used a similar standard in cases involving charges of negligent infliction of emotional distress. See, Bass v. Nooney Co., 646 S.W.2d 765 (Mo. 1983) (the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant); Barnhill v. Davis, 300 N.W.2d 104 (Iowa 1981) (the emotional distress to a bystander must be serious). The record shows that prior to the termination of the State's investigation of the St. Elizabeth burn unit, the plaintiff's mental distress was, as a matter of law, not of sufficient severity to warrant compensation.
With respect to the emotional distress which the plaintiff may have suffered after learning of the completion or termination of the State's investigation of the St. Elizabeth burn unit, the record establishes that the defendants' alleged negligence was not the proximate cause of Turek's then intensified emotional distress.
As noted previously, regarding the State's investigation, the plaintiff testified, "I think just the fact that it was eliminated without virtually any body taking any responsibility for what was done, I think, is what upset me more than anything." The plaintiff also testified that while the State's investigation triggered memories of his experience in the St. Elizabeth burn unit, "the big thing was when it just was dismissed.... It just leveled me. I couldn't believe it." Thus, the record shows that any compensable emotional distress which the plaintiff may have suffered was caused by his dissatisfaction with the State's disposition of its investigation of the defendants.
While it may have been foreseeable that the plaintiff might suffer some slight emotional distress upon learning that Nurse Gillespie was unlicensed to perform the procedures which she had performed, it could not be anticipated that it might cause the plaintiff severe emotional distress. Consequently, giving the plaintiff the benefit of all reasonable inferences, the record before us establishes that the defendants' alleged negligence did not proximately cause any compensable injury to the plaintiff.
It is unnecessary to consider any of the other assignments of error or the other grounds on which summary judgment was properly granted.
The judgment is affirmed.
AFFIRMED.
HASTINGS, C.J., not participating.