Massoud MALEKI, M.D., Plaintiff-Respondent,†

v.

FINE-LANDO CLINIC CHARTERED, S.C.,
Defendant-Appellant,

Eddy D. CO, M.D., Defendant-Co-Appellant.

Court of Appeals

*No. 88-2027. Oral argument November 14, 1989.—Decided
January 25, 1990.*

(Also reported in 453 N.W.2d 208.)

† Petition to review granted.

For the plaintiff-respondent the cause was submitted on the briefs of *Resnick, Jacquart & Hart,* with *Richard H. Hart* and *Donald J. Jacquart* of counsel, of Milwaukee. Oral argument by *Richard H. Hart.*

For the defendant-appellant the cause was submitted on the briefs of *Machulak & Hutchinson,* with *David H. Hutchinson* of counsel, of Milwaukee and *Michael, Best & Friedrich,* with *David J. Cannon* and *Kevin P. Reak,* of Milwaukee. Oral argument by *David J. Cannon.*

For the defendant-co-appellant the cause was submitted on the briefs of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.,* with *Thomas J. Binder* of counsel, of Milwaukee. Oral argument by *Thomas J. Binder.*

Before Brown, P.J., Sullivan and Fine, JJ.

FINE, J.[1]  This is an action brought by Massoud Maleki, M.D., under sec. 134.01, Stats., alleging, as pertinent to this appeal, that he was the victim of a conspiracy between the Fine-Lando Clinic and Eddy D. Co, M.D.[2] A jury returned a verdict that was partially in Maleki's favor, and awarded him $331,833 in compensatory damages and $510,000 in punitive damages. We reverse.

---

[1]The author of this opinion is not related to anyone who is, or ever has been, associated with the Fine-Lando Clinic.

[2]Trinity Memorial Hospital of Cudahy, also alleged by Maleki to be a co-conspirator, was dismissed from the action and is not a party to this appeal. In addition to his claim under sec. 134.01, Stats., Maleki also sought recovery under various other theories, including Fine-Lando and Co's alleged violation of sec. 133.03, Stats., Wisconsin's reenactment of the first two sections of the Sherman Antitrust Act, 15 U.S.C. secs. 1 and 2, *see Reese v. Associated Hosp. Serv.,* 45 Wis. 2d 526, 532, 173 N.W.2d 661, 664 (1970). The claims based on these alternate theories were dismissed before trial and are not at issue here.

## I.

Maleki and Co are invasive cardiologists, physicians who perform catheterizations, angioplasties, and pacemaker implantations. At the time of trial, Fine-Lando was a multi-specialty medical clinic employing fourteen full-time and three part-time physicians. The clinic is owned by thirteen shareholders, all of whom are physicians.

Maleki testified that in 1976, Robert C. Tabet, M.D., an officer of Fine-Lando, and then chief of internal medicine at Trinity, asked Maleki to practice cardiology at Trinity, which was located four or five blocks from the clinic. According to Maleki, Tabet told him that physicians at Fine-Lando wanted Maleki to work with them and to be available for patient referrals. Maleki testified that he explained to Tabet that he was reluctant to accept the invitation because he had "other staff privileges and other commitments in other hospitals," some of which he would have to relinquish if he took staff privileges at Trinity, and that he would need "assurance that I would have their support." Maleki told the jury that Fine-Lando promised to "be supportive of my practice." Maleki admitted, however, that neither a definite number nor any specific percentage of patient referrals from Fine-Lando was ever discussed.

Maleki testified that he believed Tabet's proposal was a good one, and that he therefore applied for staff privileges at Trinity, though he recognized that it, like any other "business decision," as he characterized it during the course of his testimony, involved a risk. He explained to the jury:

> Well, really my only expectation at that point—I think they had invited me, I had accepted and that's as far as I could expect insofar as their part goes. The

rest was up to me to be there, be present, be available and prove that I can provide what they were seeking and then develop more and more practice.

Maleki's application for staff privileges at Trinity was accepted in early 1978, and he started to perform cardiac procedures at Trinity on referrals from Fine-Lando.

Tabet's recollection of his conversations with Maleki differed from Maleki's testimony. Tabet testified that in the mid-1970s, Trinity had opened a cardiac catheterization department, and the hospital was anxious to recruit cardiologists to make use of that facility. Tabet told the jury that he "talked to all the cardiologists that [he had] met at one time or another to let them know that it was an open Cardiac Catheterization Department," adding that "[a]nybody could apply to get into it." He testified that Maleki was one of the cardiologists to whom he had spoken, and that he told Maleki that "[i]t was an open department and he could, if he so desired, put in his application." Tabet denied telling Maleki that Fine-Lando would support his practice.

According to Trinity records, Maleki performed twenty-one cardiac catheterizations at the hospital in 1978, forty-two in 1979, thirty-six in 1980, twenty-eight in 1981, and four in 1982. He performed no cardiac catheterizations at Trinity from 1983 through 1986. During that same period, however, Maleki was busy elsewhere. Indeed, Maleki performed a total of two hundred and one cardiac procedures in 1980 (including the thirty-six catheterizations at Trinity), a total of two hundred and twenty-three in 1981 (including the twenty-eight catheterizations at Trinity), a total of two hundred and thirty-six in 1982 (including the four catheterizations at Trinity), two hundred and forty-two in 1983, two hundred and fifteen in 1984, two hundred and forty-six in 1985,

and two hundred and eighty-four in 1986. In 1981, Maleki's gross income exceeded $353,000; it was more than $444,000 in 1982; more than $492,000 in 1983; more than $432,000 in 1984; more than $520,000 in 1985; and more than $504,000 in 1986.

Maleki claimed that his failure to do any procedures at Trinity after 1982 was the result of his refusal to split with Fine-Lando the fees he earned as a result of referrals from the clinic. Maleki testified that in the summer of 1981, a member of Fine-Lando, Ali Tavaf, M.D., told him that the clinic wanted to have a more formal, contractual, relationship with him. Maleki described for the jury Tavaf's proposal as follows:

> That they would continue referring patients to me as they did before, but they would be doing the billing and that I had to agree to pay a certain percentage of that, of the bills that I was generating to the clinic for their costs and the rest then would be my portion.

Maleki testified that he told Tavaf the proposal sounded like fee splitting, and that he was "not interested in that." Tavaf and Tabet both disputed Maleki's testimony, and denied that Fine-Lando had ever suggested the arrangement.

Maleki testified that following his rejection of Tavaf's proposal, there was a "slow-down of referrals" from Fine-Lando that was "rather rapid," until he received no referrals at all. There was also testimony concerning two of Maleki's patients from which the jury could have concluded that Fine-Lando physicians were not aggressive in accommodating one patient's desire to have Maleki perform a catheterization for her, or in referring the other patient to Maleki. Additionally, an invasive cardiologist testified that "[o]n one occasion" a physician with Fine-Lando, whom he declined to name,

476

told him not to use Maleki for an angioplasty. Two Fine-Lando physicians testified, however, that even after the alleged Fine-Lando/Co conspiracy they continued to refer patients to Maleki for either procedures that were done at St. Luke's Hospital, or consultations. As noted earlier, although he had a substantial practice elsewhere, Maleki performed no cardiac catheterizations at Trinity from 1983 through 1986, and did only four such procedures in 1982. There was no evidence, however, that Maleki's privileges at Trinity were affected.

Although he did not have documentary proof at the time his referrals from Fine-Lando declined, Maleki told the jury that he suspected "that there was some kind of arrangements [sic] made between Dr. Co and Fine-Lando." In fact, Co, who had been doing procedures at Trinity since 1976, contracted with the clinic, effective November 1, 1981.[3] The provisions of the Fine-Lando/Co contract were similar to the proposal Maleki testified he rejected. Under the contract, Co was to provide consulting cardiology services for Fine-Lando patients, and Fine-Lando was to furnish various support services such as office space, record keeping, insurance, and nursing. Co was to be paid sixty percent of what was collected by the clinic for his services. Maleki testified that this contract constituted, in his view, illegal fee splitting.[4] Co

---

[3] Co performed five cardiac catheterizations at Trinity in 1976, sixty-four in 1977, fifty-five in 1978, seventy-five in 1979, ninety-three in 1980, one hundred thirty-two in 1981, one hundred fifty-one in 1982, one hundred twenty-six in 1983, one hundred twenty-four in 1984, one hundred thirty-nine in 1985, and one hundred twenty-six in 1986.

[4] Section 448.08(1), Stats., provides:

FEE SPLITTING. Except as otherwise provided in this section, no person licensed or certified under this chapter may give or receive, directly or indirectly, to or from any person, firm or corporation any

and two physicians from Fine-Lando disagreed with Maleki's assessment, and there was a conflict in the testimony as to whether Co received sufficient services from Fine-Lando to account for the clinic's forty-percent charge.[5]

Maleki testified that he thought Co contracted with Fine-Lando for two reasons: to make money and to eliminate competition. Maleki also testified that though he did not believe that Co "had any animosity" toward him, he did think that Co bore him "ill will."[6]

---

fee, commission, rebate or other form of compensation or anything of value for sending, referring or otherwise inducing a person to communicate with a license in a professional capacity, or for any professional services not actually rendered personally or at his or her direction.

Violation of this provision subjects the offender to maximum penalties not to exceed a $10,000 fine, incarceration for not more than nine months, or both. Sec. 448.09(1), Stats.

[5]Although extensive evidence of the alleged fee-splitting aspects of the Fine-Lando/Co arrangement was admitted over the defendants' objection, the special verdict did not ask whether the arrangement violated sec. 448.08(1). Additionally, the trial court denied the defendants' request to instruct the jury as to what would constitute illegal fee-splitting under the statute. Rather, the trial court told the jury that it was "free to determine whether the arrangement violated the statute or not," and, if they believed that it did, to "weigh this evidence along with all the other evidence admitted."

[6]The jury learned that Maleki's pre-trial deposition testimony on this point was as follows:

Q  Now, prior to November of 1981, did you believe that either Dr. Co or Fine-Lando Clinic had any particular animosity toward you?

A  Absolutely not.

Q  Any particular ill will towards you?

A  Not a thing, that I know.

## II.

Section 134.01, Stats., provides:

**Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Section 134.01 casts a protective cloak over two main areas: a person's "reputation, trade, business or profession," and a person's decision to do "any lawful act," or to refrain from doing "any act against his will." The jury was asked to determine the defendants' liability under both parts of the statute.

The first question presented to the jury in the special verdict asked:

Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire for the purpose of willfully or maliciously injuring Dr. Maleki's trade or business?

The jury answered this question "No." The second question asked:

Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire to maliciously prevent or hinder Dr.

---

Co testified that in 1980 he helped elect Maleki as director of Trinity's catheterization department.

Maleki from doing or performing any cardiac procedures?

The jury answered this question "Yes." As we have seen, the jury awarded substantial compensatory and punitive damages.

Although Fine-Lando and Co assert various grounds for reversal, we limit our discussion to the dispositive issue: whether Fine-Lando and Co's actions, as established by the evidence evaluated in a light most favorable to Maleki, *see* Rule 805.14(1), Stats., support the jury's answer to the second question. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

As Maleki's counsel explained during the course of oral argument, the crux of Maleki's case is that Fine-Lando stopped making referrals to him because he refused the clinic's proposal to split the fees generated by those referrals. Since there is sufficient evidence of record to support this contention, even though there is also contrary evidence, we must determine whether the cessation of Fine-Lando referrals to Maleki because Maleki would not split fees with the clinic is actionable under sec. 134.01, Stats. We conclude that it is not.

Section 134.01, Stats., was first enacted in 1887 as chapter 287 of the Laws of Wisconsin. Originally codified as sec. 4466a, Stats., *see* Wis. Stats. Ann. (Sanborn & Berryman 1889), it has never been amended. [7] The "restraint of will" part of the statute, under which Fine-Lando and Co were found liable, requires that the conspiracy be undertaken with a malicious purpose; there

---

[7]The provision was renumbered as sec. 343.681, Stats. (1925), by 1925 Wis. Laws ch. 4, and became sec. 134.01, Stats. (1955), by 1955 Wis. Laws ch. 696, sec. 134. The statute will be referred to as sec. 134.01 throughout this opinion.

must be (1) a conspiracy, and (2) the conspiracy must be "for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." Sec. 134.01, Stats. *See Schultz v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 151 Wis. 537, 548, 139 N.W. 386, 391 (1913) (closely following a person in order to prevent him from leaving town is within purview of statute). In this case, our analysis is limited to the "preventing or hindering" aspect, since the jury found that Fine-Lando and Co conspired "to maliciously prevent or hinder Dr. Maleki from doing or performing" cardiac procedures.[8]

A conspiracy exists when there is concerted action to accomplish either an unlawful result or a lawful result by unlawful means. *Martens v. Reilly,* 109 Wis. 464, 473, 84 N.W. 840, 843 (1901); *cf. Mendelson v. Blatz Brewing Co.,* 9 Wis. 2d 487, 490, 101 N.W.2d 805, 807 (1960) (claim under sec. 134.01 not asserted). The prerequisite "malice" under sec. 134.01, Stats., overlaps, but is distinct from, the predicate components of a conspiracy. "Malice," as that term is used in sec. 134.01, requires an "intent to injure," which has been defined as a "wrongful act" done with the malevolent desire to invade the "right" of another. *State ex rel. Durner v. Huegin,* 110 Wis. 189, 259–263, 85 N.W. 1046, 1065–1067 (1901);

---

[8]Since the case was not tried on the theory that Fine-Lando and Co combined for "the purpose of maliciously *compelling*" Maleki to agree to an alleged fee-splitting arrangement with the clinic, *see* sec. 134.01, Stats. (emphasis added), and there is no evidence in the appellate record that would support an inference that Co had this purpose, we express no opinion as to whether recovery under that theory would have been permitted under sec. 134.01.

*Aikens v. Wisconsin,* 195 U.S. 194, 206 (1904) (interpreting *Durner,* which was the same case at an earlier stage of the proceedings).[9] *See also Hawarden v. Youghiogheny & Lehigh Coal Co.,* 111 Wis. 545, 550–551, 87 N.W. 472, 474 (1901). Thus, as *Durner* explains:

> "Lawful competition that may injure the business of another, even though successfully directed to driving that other out of business, is not actionable. Nor would competition of one set of men against another set, carried on for the purpose of gain, even to the extent of intending to drive from business that other set and actually accomplishing that result, be actionable unless there was actual malice. 'Malice,' as here used, does not merely mean an intent to harm, but means an intent to do a *wrongful harm* and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the *right* of another, it is malicious; and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition."

*Id.,* 110 Wis. at 259–260, 85 N.W. at 1066 (emphasis added) (quoting *Doremus v. Hennessy,* 176 Ill. 608, 52 N.E. 924, 926 (Ill. 1898)).

---

[9]There is an ostensible conflict as to whether the requisite malevolence must be the defendants' only motive. *Compare Aikens,* 195 U.S. at 206 (statute criminally punishes only those combinations where malevolent "intent to do wrongful harm" is only motive) *with Radue v. Dill,* 74 Wis. 2d 239, 246, 246 N.W.2d 507, 511 (1976) (an alleged conspiracy under sec. 134.01 is not civilly actionable if "the defendants' purpose was solely to protect their own interests"). We need not attempt to resolve this seeming inconsistency, however, in light of our conclusion that there is no evidence that Fine-Lando and Co invaded any of Maleki's legal rights.

Section 134.01, Stats., protects those against whom a conspiracy may be directed "rather than the public as a whole." *Gerol v. Arena,* 127 Wis. 2d 1, 10, 377 N.W.2d 618, 622 (Ct. App. 1985). Thus, our inquiry must focus on whether the termination of the referrals from Fine-Lando violated any of Maleki's legal "rights." *See Radue v. Dill,* 74 Wis. 2d 239, 244-245, 246 N.W.2d 507, 510-511 (1970) (Section 134.01 provides a civil remedy for the concerted invasion of a legal right, that is, "where the combination itself has for its purpose the doing of an unlawful act.") (perjury). *Cf. Randall v. Lonstorf,* 126 Wis. 147, 152-153, 105 N.W. 663, 664 (1905) (complaint alleging conspiracy to prevent plaintiff from fulfilling obligations and receiving benefits of marital contract stated a cause of action under sec. 134.01); *Rhyner v. Hartl,* 239 Wis. 589, 594, 2 N.W.2d 248, 251 (1942) (viable cause of action requires "a right in the plaintiff and a wrongful invasion of that right by the defendant"). Whether there has been an invasion of any of Maleki's legal "rights" requires an analysis of legal principles extant at the time of sec. 134.01's original enactment. *See Durner,* 110 Wis. at 261-262, 85 N.W. at 1066 (statute declaratory of the common law). Stated another way, sec. 134.01 is not a petri dish in which we may culture new "rights" absent legislative action. *Cf. Gerol,* 127 Wis. 2d at 9-13, 377 N.W.2d at 622-623 (Common law damages apply to violations of sec. 134.01, since statute "is silent as to remedy.").

Maleki does not contend that the vague terms of Tabet's alleged oral promise amounts to an enforceable contract. *See Witt v. Realist, Inc.,* 18 Wis. 2d 282, 297, 118 N.W.2d 85, 93 (1962) ("To be enforceable a contract must be definite and certain as to its basic terms and requirements. It must spell out the essential commit-

ments and the obligations of each party with reasonable certainty."). *See also* Restatement (Second) of Contracts sec. 33 (1979) (no contract is formed unless terms are reasonably certain). Rather, he argues that sec. 134.01, Stats., itself, transforms his desire to receive Fine-Lando referrals into a protected legal right that cannot be invaded when to do so would benefit the Fine-Lando/Co arrangement, which he contends is fee-splitting and contrary to the public interest. We disagree.

The prohibition against fee-splitting found in sec. 448.08(1), Stats., protects members of the public who might otherwise be subjected to treatment by a "physician or surgeon offering [the referring physician] the largest fee or commission, regardless of his ability or skill." 3 Op. Att'y Gen. 218, 219 (1914). It does not create a right that is enforceable by physicians whose business might be adversely affected by an illegal fee-splitting arrangement.[10] *See* sec. 448.11, Stats. (Either the Medical Examining Board or the Attorney General may "bring action in the name and on behalf of the state" to enjoin a person from violating the provisions of chapter 448 or the rules promulgated by the board thereunder.). *Cf. West Allis Memorial Hosp. v. Bowen*, 852 F.2d 251, 255 (7th Cir. 1988) (Medicare/Medicaid anti-fraud provisions in 42 U.S.C. sec. 1395nn(b) do not create a private remedy for health care providers who lose business as the result of a competitor's noncompliance with those provisions). A violation of sec. 448.08(1) does not, therefore, provide the basis for a claim under sec. 134.01. Additionally, although Wisconsin recognizes the

---

[10]We express no view whether a physician who enters into an illegal fee-splitting contract may defend an action alleging breach of that contract on the ground that the contract was against the public policy declared by sec. 448.08(1), Stats.

common-law right not to be significantly injured in business by the concerted action of those with monopoly power, *Hawarden,* 111 Wis. at 549–551, 87 N.W. at 473–474; *Durner,* 110 Wis. at 261–262, 85 N.W. at 1066,[11] and, of course, provides redress for the violation of sec. 133.03, Stats.,[12] there is no general affirmative duty to deal, *see Hawarden,* 111 Wis. at 550, 87 N.W. at 474 ("persons have a right to combine together for the purpose of promoting their individual welfare in any legitimate way"). *Cf. State ex rel. Wolf v. LaCrosse Lutheran Hosp. Ass'n,* 181 Wis. 33, 37, 193 N.W. 994, 995 (1923) (right of doctor to continue practice of medicine at private hospital depends on existence of contract between doctor and hospital).[13] Since Maleki has not demonstrated any legal right to an unremitting stream of referrals from Fine-Lando, termination of those referrals, even if it was to further Fine-Lando's arrangement with Co, does not subject Fine-Lando and

[11]There is no evidence that Fine-Lando and Co had the intent or the means either to put Maleki out of business, or to significantly interfere with his ability to practice invasive cardiology. Indeed, the jury specifically found that Fine-Lando and Co did not "conspire for the purpose of willfully or maliciously injuring Dr. Maleki's trade of business." Rather, the undisputed evidence demonstrates that Maleki was free to practice invasive cardiology any place he chose, including Trinity, and his practice was extremely successful even without the referrals from Fine-Lando.

[12]As noted, Maleki's claim under sec. 133.03, Stats., was dismissed by the trial court, and he has not sought appellate review of that dismissal.

[13]The right of public hospitals to terminate a relationship with a physician is more limited. *See Johnson v. City of Ripon,* 259 Wis. 84, 86, 47 N.W.2d 328, 329–330 (1951). *See also* Annotation, *Exclusion of or Discrimination Against Physician or Surgeon By Hospital,* 37 A.L.R.3d 645 (1971).

Co to liability under sec. 134.01, Stats. Accordingly, the judgment must be reversed.

*By the Court.*—Judgment reversed.