Massoud MALEKI, M.D., Plaintiff-Respondent-Petitioner,

v.

FINE-LANDO CLINIC CHARTERED, S.C., Defendant-Appellant,

Eddy D. CO, M.D., Defendant-Co-Appellant.

Supreme Court

*No. 88-2027. Argued January 24, 1991.—May 23, 1991.*

(Also reported in 469 N.W.2d 629.)

74

For the plaintiff-respondent-petitioner there were briefs by *Adrian N. Cohen, Mark M. Leitner* and *Charne, Clancy & Taitelman, S.C.* and *Donald J. Jacquart* and *Richard H. Hart,* all of Milwaukee and oral argument by *Mr. Jacquart.*

For the defendant-appellant there was a brief by *David H. Hutchinson* and *Machulak & Hutchinson* and *David J. Cannon, Kevin P. Reak* and *Michael, Best & Friedrich,* all of Milwaukee and oral argument by *Mr. Cannon.*

For the defendant-co-appellant there was a brief by *Thomas J. Binder* and *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.,* Milwaukee and oral argument by *Mr. Binder.*

HEFFERNAN, CHIEF JUSTICE. This is a review of a decision[1] of the court of appeals reversing the judgment of the circuit court for Milwaukee county, Patricia S. Curley, Judge, that held that Fine-Lando Clinic and Dr. Eddy D. Co were liable to Dr. Massoud Maleki for damages allegedly caused by a conspiracy between Fine-Lando and Dr. Co. We affirm because there is insufficient evidence to support the existence of a necessary element of a civil conspiracy, that the parties to the conspiracy acted "maliciously." Specifically, there is no evidence sufficient in law to support a finding that Dr. Co acted maliciously, as that term is defined in the context of a civil conspiracy.

The claimed conspiracy arose when Fine-Lando, through its agents or employees, allegedly suggested to Maleki, an invasive cardiologist surgeon, that a condition of continued surgical referrals from Fine-Lando, a multi-specialty clinic with at least some emphasis on cardiology, would be dependent upon Maleki's entering

---

[1]154 Wis. 2d 471, 453 N.W.2d 208 (1990).

into an agreement to share fees with Fine-Lando. Maleki refused to enter into such agreement, telling the representative of Fine-Lando that he considered the proposed arrangement to be fee-splitting, prohibited by sec. 448.08(1), Stats.[2] Thereafter, Maleki testified, his referrals from Fine-Lando dropped to zero. Maleki later learned that Co entered into an agreement with Fine-Lando similar to the one proposed to Maleki and commenced receiving a large number of surgical referrals from the Fine-Lando Clinic.

Maleki commenced an action in the Milwaukee county circuit court alleging that he was the victim of a conspiracy between Fine-Lando Clinic and Co in violation of sec. 134.01, Stats.[3] Although other allegations of restraint of trade were asserted, all except the action brought under sec. 134.01 were abandoned or dismissed at the trial level. On this review, only the cause of action arising under sec. 134.01 is at issue,[4] and only sec. 134.01

---

[2] **448.08 Fee splitting; separate billing required, partnerships and corporations; contract exceptions. (1)** Fee splitting. Except as otherwise provided in this section, no person licensed or certified under this chapter may give or receive, directly or indirectly, to or from any person, firm or corporation any fee, commission, rebate or other form of compensation or anything of value for sending, referring or otherwise inducing a person to communicate with a licensee in a professional capacity, or for any professional services not actually rendered personally or at his or her direction.

[3] **134.01 Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

[4]The trial court dismissed the cause of action for antitrust

was considered by the court of appeals in reaching its decision.

The following facts pertinent to this review were adduced at trial:

Maleki testified that, in 1976, Doctor Tabet, an officer of Fine-Lando, approached him and asked him to practice cardiology at Trinity Hospital, which was located near the Fine-Lando Clinic. Maleki stated that he first declined, because it would limit the exercise of his staff privileges at other hospitals, but Maleki asserted that Tabet said Fine-Lando would be supportive of Maleki's practices. This latter statement was denied by Tabet. Maleki did, however, accept Tabet's suggestion and his application for staff privileges at Trinity Hospital as an invasive cardiologist was accepted in early 1978, and he immediately commenced performing surgical procedures, apparently on referrals from Fine-Lando.[5]

brought under sec. 133.03, Stats., on March 17, 1985. That count, realleged, and an amended count alleging racketeering under RICO (18 U.S.C. § 196) were subsequently dismissed. The trial court in its order of January 22, 1986, recognized that only the conspiracy charge under sec. 134.01 was at issue, thus disposing of any reliance on a common-law conspiracy claim. A claim based on promissory estoppel was also dismissed and is no longer in contention. Because none of these dismissed or abandoned claims is asserted on this review, we have no occasion to consider whether or not the trial court made correct determinations in regard to those no-longer relevant claims.

[5]Maleki performed the following number of procedures at Trinity on the referral of Fine-Lando: 21 in 1978, 42 in 1979, 36 in 1980, 28 in 1981, and 4 in 1982. Thereafter, his referrals, he claimed, dropped to zero. However, he performed numerous procedures at other hospitals. Including the procedures at Trinity, he performed 201 in 1980, 223 in 1981, 236 in 1982, 242 in 1983, 215 in 1984, 246 in 1985, and 284 in 1986. His income in 1981

It was in 1981, Maleki testified, that a partner in Fine-Lando, Dr. Ali Tavaf, stated that, if referrals were to continue, Maleki would have to agree to pay a percentage of the fees earned to Fine-Lando. It was this proposition that was refused, because Maleki considered it an illegal fee-splitting arrangement. While witnesses for Fine-Lando denied that this offer was ever made, Maleki testified it was soon thereafter the diminution of referrals from Fine-Lando commenced. There was also testimony that two patients at Fine-Lando were discouraged from having procedures performed by Maleki. One invasive cardiologist stated that he was told by a Fine-Lando physician not to use Maleki for angioplasty. Two Fine-Lando physicians testified that they continued to refer patients to Maleki for procedures to be performed at hospitals other than Trinity.

The other party to the alleged conspiracy, as the proof developed at trial, was asserted by Maleki to be Dr. Eddy Co, an invasive cardiologist who had staff privileges at Trinity since 1976, a couple years before Maleki became a member of the staff.

Maleki testified that he suspected "that there was some kind of arrangements [sic] made between Dr. Co and Fine-Lando." There was evidence adduced at trial that Co had entered into an agreement with Fine-Lando similar to the one Maleki said he had rejected.

When Maleki was asked why he believed Co contracted with Fine-Lando, he stated that it was to make money and to eliminate competition. He stated that he did not believe that Co had any animosity toward him but he did think Co bore him "ill will." This testimony was contrary to a pre-trial deposition that was placed before the jury in which Maleki concluded that neither

exceeded $353,000, $444,000 in 1982, $492,000 in 1983, $432,000 in 1984, $520,000 in 1985, and more than $504,000 in 1986.

Fine-Lando nor Co had any animosity or ill will in respect to him.

The upshot of this testimony at the circuit court level was submission to the jury of two questions, both based upon provisions of sec. 134.01, Stats. The court of appeals correctly concluded that these questions mirrored the protections afforded by sec. 134.01.

The first question addressed to the jury was:

> Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire for the purpose of willfully or maliciously injuring Dr. Maleki's trade or business?

The jury answered this first question "No."
The second question asked:

> Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire to maliciously prevent or hinder Dr. Maleki from doing or performing any cardiac procedures?

The jury answered this question "Yes."

The jury awarded $331,833 in compensatory damages and $510,000 in punitive damages. The verdict and damage awards were approved by Judge Patricia Curley. Appeal was taken from the judgment subsequently entered. The court of appeals reversed, saying:

> [W]e limit our discussion to the dispositive issue: whether Fine-Lando and Co's actions, as established by the evidence evaluated in a light most favorable to Maleki . . . support the jury's answer to the second question.

*Id* at 480.

However, the court of appeals limited its evidentiary inquiry to whether there was evidence that Fine-Lando

stopped making referrals to Maleki because Maleki refused to enter into a fee-splitting arrangement. It found, because there was some evidence to support that conclusion, the only question was whether the conduct of Fine-Lando created a cause of action. It concluded it did not, because Maleki "ha[d] not demonstrated any legal right to an unremitting stream of referrals from Fine-Lando, termination of those referrals, even if it was to further Fine-Lando's arrangement with Co, does not subject Fine-Lando and Co to liability under sec. 134.01, Stats." *Id.* at 485–86.

Thus, the court of appeals reversed the circuit court on the theory that there can be no liability unless the conspiracy interfered with Maleki's independent right, and held that, because Maleki had no contractual right to the flow of referrals, he, therefore, could not be damaged by a conspiracy that eliminated those referrals.

We agree with the court of appeals decision that the judgment of the circuit court awarding damages to Maleki must be reversed, first, because the jury answers to Question One and Question Two are inconsistent and, second and more importantly, that evidence of malice, which must be found in respect to both conspirators, is lacking in respect to Co.[6] Also, we conclude—although this conclusion is not necessary to the resolution of this review—that the court of appeals erred when it relied upon a principle not recognized in Wisconsin that there

---

[6]It should be noted that the court of appeals by order dated October 12, 1989, directed that this case be orally argued specifically to explore the question of malice. Yet, the opinion all but ignores a discussion of that essential element of a civil conspiracy as specifically applied to the alleged conspirators in this case. The question of Co's malice was addressed extensively by Co's counsel at oral argument in this court.

can be no recovery for conspiracy unless an independent right is invaded. Contrary to the assertion of the court of appeals that sec. 134.01, Stats., "is not a petri dish in which we may culture new 'rights' absent legislative action" (*Id.* at 483), the clear legislative intent of sec. 134.01 is that the right protected by the legislative action is not to be damaged in any respect by conspiratorial conduct. The question is: Was the plaintiff damaged by a conspiracy? Wisconsin law is devoid of a legal premise that would support the ratio decedendi of the court of appeals. The review sought in this court by Maleki is premised upon his correct assertion that the plaintiff does not have to demonstrate an independent legal right for there to be civil liability under sec. 134.01. Nevertheless, we are obliged on other grounds to affirm the court of appeals decision to reverse the trial court judgment in favor of Maleki.

We conclude that the verdict questions resulted in inconsistent answers. The answer to the first being unfavorable to the plaintiff, and the answer to the second being favorable. We conclude, however, that the evidence was insufficient to support an affirmative answer to either question and, therefore, the judgment of the trial court must be reversed.

The first question, to which the jury answered "no," was:

> Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire for the purpose of willfully or maliciously injuring Dr. Maleki's trade or business?

The jury answered "yes" to the question:

> Did both defendants, Fine-Lando Clinic and Dr. Eddy Co, combine, associate, agree, mutually undertake, or conspire to maliciously prevent or hinder Dr.

Maleki from doing or performing any cardiac procedures?

From the facts recited above, it is undisputably apparent that Maleki's "trade or business" was doing or performing cardiac procedures. The answer to Question Two is therefore inconsistent with the answer given to Question One.

As this court said in *Fondell v. Lucky Stores, Inc.,* 85 Wis. 2d 220, 228, 270 N.W.2d 205 (1978), "An inconsistent verdict is a term of art used in describing jury answers which are logically repugnant to one another."

In *Westfall v. Kottke,* 110 Wis. 2d 86, 328 N.W.2d 481 (1983), we held that, initially, it was the duty of a trial judge to carefully consider a returned verdict to ascertain the possibility of inconsistency and, if inconsistency is discovered, to return the verdict immediately to the jury for reconsideration. We said that, in the event there were not a timely reconsideration by the jury, there must be a new trial. *Westfall* at 98.

In the instant case, however, it appears to this court that there is no necessity of a remand, for it is apparent, as a matter of law, that the jury, properly instructed, could not have answered affirmatively to either question.[7]

We conclude that neither question as a matter of law is susceptible to an affirmative answer, because there is insufficient evidence of malice on the part of Co.

The court of appeals used an oft-repeated and almost always correct standard of review for sufficiency

[7]We are not unmindful that in *Westfall* we said, "[I]f the answer is truly one that can be decided as a matter of law, the question should have been decided by the court in the first place and not by the jury." *Id.* at 95.

of evidence—that the evidence should be evaluated in a light most favorable to the verdict. *See* Rule 805.14(1), Stats.[8] It used this test to conclude that there was sufficient evidence that Fine-Lando stopped making referrals to Maleki because he refused the clinic's proposal to split fees.

While, in our analysis of the decision, that test appears to be correct as applied to the motive of Fine-Lando, whether or not Fine-Lando acted in a certain manner and for a certain purpose becomes inconsequential if there is not evidence sufficient to support the elements of conspiracy, in this case, in respect to both of the alleged conspirators.

While inferences reasonably drawn are appropriate bases for unassailable findings of fact in most cases, and the acceptance of one inference rather than another by the jury is generally a sufficient finding of fact (*see St. Paul Fire & Marine Ins. Co. v. Burchard*, 25 Wis. 2d 288, 130 N.W.2d 866 (1964), and Currie & Heffernan, *Wisconsin Appellate Practice and Procedure*, pp. 36-7, 1975 Wis. Bar ATS), Wisconsin law in respect to conspiracies imposes a more stringent test. To prove a conspiracy, a plaintiff must show more than a mere suspicion or conjecture that there was a conspiracy or that there was evidence of the elements of a conspiracy. The

---

[8]Rule 805.14(1), Stats., provides:

**805.14 Motions challenging sufficiency of evidence; motions after verdict. (1)** Test of sufficiency of evidence. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

United States Court of Appeals for the Seventh Circuit, relying on Wisconsin cases, recently stated:

> In Wisconsin, if circumstantial evidence supports equal inferences of lawful action and unlawful action, then the claim of conspiracy [under sec. 134.01, Stats.] is not proven. *See Scheit v. Duffy,* 248 Wis. 174, 176, 21 N.W. 2d 257 (1946).

*Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.,* 898 F.2d 512 (7th Cir. 1990).

*Scheit* points out that, in such circumstances, the matter at issue should not be submitted to the jury.

Thus, it appears that in Wisconsin the credible evidence that is sufficient to sustain a jury verdict of conspiracy must be of a quantum that the trial judge can conclude leads to a reasonable inference of conspiracy. If not, it should not be submitted to a jury at all.

*Allen & O'Hara* arises out of facts analogous to those put before the court in the instant case. In *Allen & O'Hara,* at or about the same time Allen & O'Hara's contract was cancelled, one alleged to be a party to the conspiracy entered into a contract with another alleged conspirator. It was held that the circumstances did not provide evidence probative "that the conspirators acted with the specific, malicious purpose of injuring the plaintiff" (*Id.* at 516) required by Wisconsin law.

The specific element of the conspiracy action that is evidentially insufficient in the present case is the element of malice on the part of Co.

Section 134.01, Stats., provides:

**134.01 Injury to business; restraint of will.**
Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in

85

his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Both categories of sec. 134.01, Stats., require malice. The words of the legislature in the first portion of the statute are "for the purpose of wilfully or maliciously injuring," and in the second portion of the statute "for the purpose of maliciously compelling . . . or preventing" another from a lawful act.

█

Thus, malice is an integral element that must be proved in respect to either portion of the statute and must be proved in respect to both parties to the conspiracy. There can be no conspiracy if malice is not found in respect to both conspirators. *Allen & O'Hara, supra* at 516. Thus, there can be no recovery on either Question One or Question Two submitted to the jury if there is no evidence that both of the alleged conspirators were guilty of malice. We conclude that there was insufficient evidence of malicious intent to harm Maleki to sustain any verdict on either Question One or Question Two.

█

For conduct to be malicious under conspiracy law it must be conduct intended to cause harm for harm's sake.

In Wisconsin a civil conspiracy is defined "as a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Radue v. Dill* 74 Wis. 2d 239, 241, 246 N.W.2d 507 (1976).

██

*Radue,* relying on earlier cases, points out that the conspiracy alone, unlike a situation where there is a criminal conspiracy, is not the unique jural act that gives rise to a remedy. In civil conspiracy, the essence of the action is the damages that arise out of the conspiracy, not the conspiracy itself. *See Singer v. Singer,* 245 Wis. 191, 195, 14 N.W.2d 43 (1944).

A convenient starting point on the meaning of "maliciously," as used in sec. 134.01, Stats., is *State ex rel. Durner v. Huegin,* 110 Wis. 189, 85 N.W. 1046 (1901), and the associated case that went to the United States Supreme Court *sub nominee, Aikens v. Wisconsin,* 195 U.S. 194 (1904). In *Huegin,* the Wisconsin Supreme Court said:

> 'Malice,' as here used, does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another, it is malicious; and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition.[9]

*Id.* at 260.

On appeal to the United States Supreme Court, Justice Oliver Wendell Holmes, Jr., speaking for the Court, thus spoke of the element of malice in Wisconsin's conspiracy statute:

> We interpret 'maliciously injuring' to import doing a harm malevolently for the sake of the harm

---

[9]The conspiracy cases are replete with statements pointing out that competition that incidentally harms another when the purpose is to improve one's competitive advantage does not run afoul of conspiracy laws if there is not a malicious motive.

as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition].

195 U.S. at 203.

Justice Winslow, writing for this court in *Hawarden v. The Youghiogheny & Lehigh Coal Co.,* 111 Wis. 545, 550, 87 N.W. 472 (1901), said:

[P]ersons have a right to combine together for the purpose of promoting their individual welfare in any legitimate way, but where the purpose of the organization is to inflict injury on another, and injury results, a wrong is committed upon such other; and this is so notwithstanding such purpose, if formed and executed by an individual, would not be actionable.

Justice Winslow goes on to state that, while an individual can ruin another's business through malicious motives, there is no actionable redress, but if there is a combination of persons and they act, even in part as the result of malicious motives and cause the harm, the injury to another is actionable.

■■

It is apparent then that whatever other evidence is produced, an essential element of the cause of action is the malicious motive of the conspirators sought to be charged. We do not pursue the facts that may or may not lead to the conclusion that Fine-Lando was or was not actuated by malice. We need not do so, for the fact that there is no evidence of Co's malice is obvious.

Five types or items of evidence have been offered by Maleki to demonstrate that Co acted maliciously to injure him in concert with Fine-Lando. We find none of them or all of them combined to be more than marginally or speculatively probative of malice.

88

Maleki refers to the "fee splitting" agreement itself, which without doubt was agreed upon by Fine-Lando and Co. But fee-splitting prohibitions are designed to protect the public and not individual physicians. *See* 3 Op. Att'y Gen. 218, 219 (1914). There is no evidence that the agreement between Fine-Lando and Co was for the purpose of malevolently causing injury to Maleki. To the contrary, the clear motive was to enhance profits for Fine-Lando and Co. Maleki did not assert malice on the part of Co. He asserted the profit motive as reason for Co's actions and only marginally and contradictorily did he even ascribe any ill will or animosity toward him on the part of Co. Ascriptions of attitude even if true fall short of being evidence of malicious action or conduct.

Maleki also points to the fact that, after the fee-splitting proposal was rejected by him, the referrals from Fine-Lando soon fell off to zero. While this sequence of events might marginally point to some vindictiveness on the part of Fine-Lando, it does not even purport to implicate Co's motives. Indeed, it appears to be mere evidence of Fine-Lando's legitimate unwillingness to deal with Maleki solely on the basis of business advantage and has little probative value of malice even in respect to Fine-Lando. The important point is that the episode is irrelevant in respect to Co's motives. Interestingly enough, at or about the same time Co allegedly was acting maliciously in respect to Maleki, he actively promoted Maleki's election to membership in the catheterization laboratory at Trinity Hospital, conduct that one could reasonably infer would not be intended to injure Maleki, but on the contrary to promote his professional interests.

There was also testimony of a Doctor Rogers that a Fine-Lando physician, whom he refused to name, told Rogers not to use Maleki for angioplasty procedures.

This evidence, tenuous at best in regard to Fine-Lando, is completely irrelevant in respect to Co. There is no disagreement that Co was in no way associated with this direction to divert referrals from Maleki.

In addition, two Fine-Lando patients testified that they were steered away from using Maleki by Fine-Lando. Again, Co appears not to be implicated in this diversion.

Looking at the record as a whole, there is really no evidence that Co had any malicious intent to injure Maleki for the sake of injury. Even if the rule were not as correctly stated in *Allen & O'Hara,* there is no evidence of any malicious motive on the part of Co.

The rule in *Allen & O'Hara* points out that substantially equal inferences pointing to malice are insufficient to allow the question to go to the jury. Here, it would be stretching the probativeness of the evidence relied upon by Maleki to conclude that any reasonable inference whatsoever could arise that Co acted with malice. There simply was insufficient evidence to associate Co with a malicious conspiracy intended to cause hurt or injury to Maleki.

■

The inconsistent verdict demonstrates the jury's problems with the proof placed before it. While, as we have pointed out, the usual remedy where the jury verdicts are repugnant to each other and are inconsistent is to remand for a new trial, here the evidence adduced is insufficient to support either. The trial judge, under the state of the record, as a matter of law, should have dismissed Maleki's action on the basis of insufficient evidence. We are obliged to do so at this juncture and, accordingly, affirm the decision of the court of appeals reversing the judgment of the trial court—but on the ground that, because there is insufficient evidence of

malice on the part of at least one alleged conspirator, Co, a statutory element has not been proved and, as a matter of law, there can be no sec. 134.01, Stats., conspiracy.

While the evidentiary question is dispositive, it was not the basis used by the court of appeals to reach the same result. The court of appeals mandated its reversal on the stated ground that:

> Since Maleki had not demonstrated any legal right to an unremitting stream of referrals from Fine-Lando, termination of these referrals, even if it was to further Fine-Lando's arrangement with Co, does not subject Fine-Lando and Co to liability under sec. 134.01, Stats.

154 Wis. 2d at 485–86.

We believe that this conclusion asserting that there be a prior independent right violates elementary principles of civil conspiracy law long recognized in Wisconsin.

Our determination that, under the evidence, Co did not act "willfully and maliciously"[10] in respect to Maleki requires the affirmance of the decision of the court of appeals on the ground that the evidence was insufficient.

The court of appeals, as we have stated, principally relied upon the theory that Maleki had no "right" to an "unremitting stream of referrals" from Fine-Lando. Hence, the reasoning of the court of appeals seems to be that, if Maleki suffered damage, it was a damage for which the law would offer no recourse, because he had no underlying cause of action or right to the referrals. The court of appeals bolsters this argument with the statement, "Maleki does not contend that the vague terms of

---

[10]It should be noted that Justice Holmes in *Aikens* pointed out that the words of the statute must be read conjunctively and not disjunctively. Wisconsin law has thereafter accepted that interpretation.

Tabet's alleged oral promise amounts to an enforceable contract." *Id.* at 483.

This is, of course, irrelevant. If the promise created an enforceable contract, there would be no purpose in alleging conspiracy. As this court stated in *Radue v. Dill,* 74 Wis. 2d at 244, quoting with approval 1 Eddy, *The Law of Combinations,* p. 398, sec. 503 (1901):

> 'If the proposition is sound that a conspiracy to do certain acts gives a right of action only where the acts agreed to be done, and in fact done, would have involved a civil injury to the plaintiff regardless of any confederation, then the combination is entirely immaterial, and the entire law of civil conspiracy is a superfluous discussion.'

It is clear that, in the Wisconsin law of conspiracy, there is no requirement of a preexisting right, the breach of which would give rise to a cause of action.

In *Radue* we said, relying upon *State ex rel. Durner v. Huegin,* 110 Wis. 189, 258–59, 85 N.W. 1046 (1901), that this state has rejected the rule that, for a cause of action for conspiracy to lie, there must be an underlying conduct which would in itself be actionable.[11] Thus, for Maleki to prevail in this instance, assuming all elements of sec. 134.01, Stats., are proved, there is no requirement that he had a right to "an unremitting stream of referrals." If he did, his cause of action would be for breach of contract or tortious interference with a business rela-

---

[11]We stated somewhat circumlocutionally at 244 that:

> Long ago, however, this court rejected the rule that no action may be maintained against the parties to a conspiracy for damages caused by acts which, if done by individuals severally, would not give rise to a cause of action.

tionship and Fine-Lando and Co could be answerable as joint tortfeasors. It is because he does not have a right that is contractual in nature that an action for damages arising out of the conspiracy is appropriate.

Although the law has recently and definitively been stated in this respect in *Radue,* it is consistent with long-stated decisional law of this court. We cite only a few examples.

In *Hawarden v. The Youghiogheny & Lehigh Coal Co.,* 111 Wis. 545, 87 N.W. 472 (1901), dock owners, wholesalers, and certain retailers conspired to deprive a particular retailer of a supply of coal for the malicious purpose of forcing that retailer out of business. A cause of action for the damages resulting from that conspiracy was recognized, although it was clear that the injured plaintiff had no right, contractual or otherwise, to an "unremitting" flow of coal. We said in that case at 550:

> [W]here the purpose of the organization is to inflict injury on another, and injury results, a wrong is committed upon such other; and this is so notwithstanding such purpose, if formed and executed by an individual, would not be actionable.

In *Lonstorf v. Lonstorf,* 118 Wis. 159, 95 N.W. 961 (1903), this court ruled that a husband did not have any right to the performance of the marital duties of his wife and, hence, had no cause of action against his mother-in-law, who allegedly alienated the affections of the wife.

Yet shortly thereafter, in *Randall v. Lonstorf,* 126 Wis. 147, 105 N.W. 663 (1905), the very facts were again before the court except that it was alleged that the mother-in-law had entered into a conspiracy with a number of other relatives to alienate the affections of the wife. The court held that a cause of action was stated, because the gist of an action for conspiracy was not the

93

breach of an underlying right. There was found to be no right in the earlier case, but in the subsequent case there was a cause of action for the damages suffered by reason of the conspiracy.

Despite the archaic discussion of the now-prohibited cause of action for alienation of affections, the sequence of these cases could not be clearer in their illustration that there need be no independent right. The right is not to be the victim of a conspiracy that results in damages. Damages are the gist of the action, and their payment by the conspirators is the remedy.[12]

*Boyce v. Independent Cleaners*, 206 Wis. 521, 240 N.W. 132 (1932), also demonstrates that the remedies to be afforded by the theory of a civil conspiracy are not dependent upon an independent right. Boyce was in the retail cleaning and dyeing business. In a fact situation remarkably like that alleged in the instant case, he was induced to abandon his own business and to relocate. After about a year, the group of conspirators made arrangements that resulted in making it impossible for him to have his dry cleaning processed. It is clear that none of the conspirators individually would have sustained any liability had he refused to deal with Boyce. There was no underlying right to deal with any of the conspirators, but the court held that a cause of action was stated. No independent right was required. All that is required is that parties conspire for a malicious purpose and damage results.

In the context of the present case, it is obvious that, if Maleki had an enforceable contract that gave rise to

---

[12]It is important to recognize, particularly in earlier cases, the court took great pains to distinguish between a criminal conspiracy, which is actionable in itself as a crime, and the civil conspiracy, where the damages resulting are the essence of the action.

some independent right, he would not have needed to bring an action for conspiracy. The rationale espoused by the court of appeals would set over one hundred years of conspiracy law at naught and render superfluous any civil conspiracy action. It would leave those damaged by a civil conspiracy remediless unless they, in addition, had a cause of action for contract or tort. That is not what conspiracy law in Wisconsin is designed to accomplish.

The discussion of the independent-right rationale is not essential to our affirmance of the court of appeals; but because we do affirm, we consider it essential to make clear that we do so on the basis of there being insufficient evidence of Co's malicious conduct and not on the aberrant theory of independent rights espoused by the court of appeals. There simply was no proof of an element essential to establish a conspiracy under sec. 134.01, Stats.—the malicious purpose of Co.

*By the Court.*—Decision affirmed.