JOSEPH P. CAULFIELD
& ASSOCIATES, INC.,
Plaintiff–Appellant,

v.

LITHO PRODUCTIONS, INC., et al., Defendants–Appellees.

No. 96–4236.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 28, 1997.

Decided Sept. 9, 1998.

Arthur G. Muegler (argued), St. Louis, MO, for Joseph P. Caulfield & Associates, Inc.

Earl H. Munson (argued), Jeffrey Kassel, Lafollette & Sinykin, Madison, WI, for Litho Productions, Inc., Robert A. Steil and Jack D. Walker.

Linda Vogt Meagher (argued), James G. Doyle, Schellinger & Doyle, Brookfield, WI, for William L. Hall.

Philip C. Reid, Robert F. Johnson, Cook & Franke, Milwaukee, WI, for Regent Insurance Company.

Before BAUER, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Joseph P. Caulfield, through his company Joseph P. Caulfield & Associates, Inc. ("Caulfield Inc."), is in the business of helping people present claims to their insurance companies. Intermediaries like Caulfield Inc. sell their experience in adjusting insurance claims to policyholders who fear that, when catastrophe strikes, the insurers may be tempted to minimize allowable claims. This case arose out of Caulfield Inc.'s contract to adjust a fire insurance claim for Litho Productions, Inc., of Madison, Wisconsin ("Litho"). Halfway through the process, Litho fired Caulfield Inc. and finished settling its claim on its own (with the help of its lawyers). Caulfield Inc. sued everyone in sight, including Litho and its president, Robert Steil; Litho's insurer, Regent Insurance Company, and Regent's parent, General Casualty Insurance Company of Wisconsin ("the Insurers"); L.J. Shaw & Co., the adjusting contractor hired by the Insurers, and the individual adjuster, William L. Hall, who worked on the Litho case; and Litho's lawyers, Jack D. Walker and Joseph A. Melli, and their law firm, Melli, Walker, Pease & Ruhly, S.C. ("Melli, Walker firm"). The district court granted summary judgment in the defendants' favor on most of the claims, but allowed contract and *quantum meruit* claims to proceed against Litho. After a full trial, the jury rejected Caulfield Inc.'s contract theory but awarded it $35,000 in damages on the *quantum meruit* theory. Caulfield Inc.

has raised objections on appeal to almost everything the district court did. Finding no error, we affirm.

## I

On January 23, 1994, an accidental fire swept through Litho's commercial printing plant and seriously damaged the building and the inventory and equipment inside. Shortly after the fire, Litho began settlement negotiations with the Insurers. The Insurers retained Shaw & Co. to adjust the claim, which in turn assigned the case to one of its employees, William Hall. Hall was responsible for performing the on-scene estimate of the damages Litho had suffered. The Insurers quickly paid Litho $400,000 in undisputed losses, but significant valuation differences between Litho and the Insurers remained. This led Litho on March 3, 1994, to hire Caulfield Inc. to represent it in the process. Under the contract, Caulfield Inc. was to "negotiate, represent, and speak" on Litho's behalf with the Insurers. In exchange, Litho agreed to pay Caulfield Inc. 10% of "any settlement ... regardless by whomsoever consummated...."

Caulfield Inc. went to work right away. Joe Caulfield prepared his own estimates of the fire damage on Litho's behalf, and in late April 1994 he submitted a partial claim for more than $4.5 million. (He labeled the claim "partial" because it excluded from the total some alleged damage to Litho's printing presses.) With respect to the loss amount, Hall had taken a far more modest view, with an initial estimate of $2.0 million. When he heard of Caulfield Inc.'s figure, Hall informed the Insurers that he regarded Caulfield Inc.'s claim as "borderline fraudulent." The Insurers took Hall's concerns very seriously. In the early summer of 1994, they told Litho that they were worried about the integrity of Caulfield Inc.'s work, and in June 1994 they exercised their right under the insurance contract to demand a "sworn proof of loss" from Litho that "no attempt to deceive" them had taken place. For its part, Litho was also displeased with the progress of its claim. Although in June 1994 it had signed a $4.9 million sworn proof of loss form to submit to the Insurers, around the same time it hired lawyers Jack Walker and Joseph Melli of the Melli, Walker firm to investigate the services Caulfield Inc. was providing. In mid-October 1994, the Insurers and their adjusters met with Litho's representatives and lawyers. Joe Caulfield, by express request of the Insurers, was not invited to the meeting and did not attend. Shortly after that meeting, the Insurers paid Litho $1.0 million for further undisputed claims.

On November 7, 1994, Litho's president, Robert Steil, wrote a three-page letter to Joe Caulfield terminating the arrangement between Caulfield Inc. and Litho. Steil claimed that Caulfield Inc.'s estimates had been "inaccurate and misleading," that Joe Caulfield's "antagonistic and adversarial" interactions with the Insurers had weakened Litho's negotiating position, and that Litho had incurred substantial investigation costs in "trying to determine what parts, if any, of the proof of loss [could] ... be used in an amended" filing with the Insurers. Steil concluded that, under the circumstances, Caulfield Inc. was not entitled to any compensation under the contract and he announced that Litho was terminating the arrangement. In keeping with that position, Litho did not pay Caulfield Inc.'s bill for $140,000, which represented 10% of the total of $1.4 million the Insurers had paid up to that time. Litho has also not paid Caulfield Inc. any commission relating to additional payments from the Insurers, which by the time the summary judgment record was compiled included at least another $475,000. (Significantly, Litho's contract with Caulfield Inc. originally provided that Litho could terminate the agreement for any reason and without penalty within 30 days of signing the contract. A Litho employee testified at trial that when he expressed concern to Caulfield Inc. about the lack of tangible results after 30 days, Caulfield Inc.'s employee, Joseph Hinkson, orally agreed to extend the termination-at-will guarantee indefinitely.)

So matters stood by early 1995. On February 15, 1995, believing that Litho had taken its work product, turned it over to the Melli, Walker firm, and evaded its contractual obligations to pay a commission, Caulfield Inc. sued the defendants described above in the federal district court for the Eastern District of Missouri, invoking the diversity

jurisdiction. (Caulfield Inc. is a Missouri corporation with its principal place of business in that state, while the rest of the defendants are either citizens of states other than Missouri or non-Missouri corporations with their principal places of business in either Wisconsin or Illinois. Joe Caulfield did not sue individually.) Some time later, the Missouri court transferred the case to the Western District of Wisconsin under 28 U.S.C. § 1404(a), which is why we now have the appeal.

Caulfield Inc.'s claims fall into five broad legal theories: (1) tortious interference with the Caulfield Inc.-Litho contract, (2) civil conspiracy, (3) fraud, (4) breach of contract, and (5) *quantum meruit*. The following chart shows which defendants were sued under which theories:

| Claim No. | Theory of Liability | Defendant(s) |
|---|---|---|
| 1 | Tortious interference with contract | all except Litho |
| 2 | Civil conspiracy | all defendants |
| 3 | Fraud | Litho and Steil |
| 4 | Breach of contract | Litho |
| 5 | *Quantum meruit* | Litho |

In an order dated August 26, 1996, the district court granted summary judgment for defendants Litho, Steil, Walker, Melli, and the Melli, Walker firm on Caulfield Inc.'s claims of tortious interference with the contract (# 1), civil conspiracy (# 2), and fraud (# 3). In a later order dated September 4, 1996, it granted summary judgment for Hall, Shaw & Co., and the Insurers on the tortious interference claims (# 1) and the civil conspiracy claims (# 2). (We note in passing that the district court's September 4, 1996, opinion granting partial summary judgment expresses some uncertainty on whether Litho was insured by Regent, its parent General Casualty, or both. Caulfield Inc.'s broadly phrased complaint (and appellate briefing) shed no light on whether it sought to hold General Casualty liable for a wrongful act committed in its own capacity, or merely for Regent's acts. If Caulfield Inc.'s theory of liability were the latter, this would simply provide another basis to support the district court's dismissal of the claims against General Casualty. See *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir.1998) (although parent company necessarily exercises some control over subsidiary's actions, parent cannot be held liable for subsidiary's wrongs unless basis exists for piercing corporate veil).)

This left for trial only Caulfield Inc.'s breach of contract and *quantum meruit* claims against Litho. At the jury trial, Caulfield Inc. portrayed the Insurers and Hall as determined to avoid coverage they properly should have furnished under the policy. Joe Caulfield testified that Litho had hired him to "stand up" to Hall. He claimed that Hall had made various errors that undercalculated Litho's losses and that Hall had actually ordered parts of the fire-damaged facility to be repaired superficially so that more serious damage would be concealed. Joe Caulfield also testified that in order to prepare Litho's claim, he had hired an accountant to help him calculate Litho's "business interruption losses," and had hired a metallurgist to test Litho's printing presses for damage that might have come from hydrochloric acid released by the fire and smoke. Joe Caulfield admitted that the accountant's estimate of Litho's "business interruption loss" was overstated, but he insisted that any errors were the result of faulty information Litho provided to the expert, not of any mistakes or misrepresentations either he or the expert committed. This proved, in his eyes, that Caulfield Inc. had performed in a professional and competent manner and had been terminated wrongfully.

In support of its *quantum meruit* claim, at trial Caulfield Inc. tendered as Exhibit 291 a four-page summary of its alleged out-of-pocket expenses incurred under the contract from March 3 through November 7, 1994, together with over 200 pages of invoices and other records that purported to document the expenses. Exhibit 291 claimed that Caulfield Inc. had spent over $166,000 preparing the claim. The trial court refused to admit the exhibit for the truth of the matter asserted, however, on the ground that it was hearsay and that Caulfield Inc. had not brought it within any recognized exception to the hearsay rules. Later, Caulfield Inc. also objected to quite a few of the trial court's instructions, including (as Caulfield Inc. disjointedly puts it in its brief on appeal) "the contract essential element, mutual assent, integrated con-

tract, not enforceable, breach and repudiation jury instructions," and "the Hinkson agency 'appearances,' apparent authority and implied authority jury instructions."

## II

 We begin first with the alleged evidentiary and jury instruction errors that Caulfield Inc. raises. The district court found that Caulfield Inc. failed to lay a proper foundation for admitting Exhibit 291 under the business records exception, which requires testimony from "the custodian or other qualified witness" about the regular record-keeping practices of Caulfield Inc. See Fed.R.Evid. 803(6). Because the foundational witness, Joe Caulfield, did not provide such testimony, the district court did not abuse its discretion in refusing to admit Exhibit 291. Cf. Collins v. Kibort, 143 F.3d 331, 337 (7th Cir.1998). Caulfield Inc.'s array of challenges to the jury instructions can be dispatched just as rapidly. With respect to the first group of objections about the contract, Caulfield Inc.'s principal argument appears to be that the instructions erroneously submitted a question of law to the jury (which we assume must be the question whether a contract actually existed between Litho and Caulfield Inc., and perhaps also how that contract should have been interpreted). With respect to the second group of objections about agency, Caulfield Inc. argues in a conclusory fashion that there was no consideration for Hinkson's promise to modify the termination provision of the contract and that the evidence did not support the instructions the court gave. Neither of these arguments is coherent, let alone developed, however, and we have repeatedly said perfunctory arguments are not enough to preserve an appeal. Otto v. Variable Annuity Life Ins. Co., 134 F.3d 841, 854–55 (7th Cir.1998); Miksis v. Howard, 106 F.3d 754, 762 n. 5 (7th Cir.1997). The jury's verdict therefore stands.

 We consider below the balance of Caulfield Inc.'s arguments, all of which relate to the district court's rulings on summary judgment. Before moving *seriatim* through those claims, however, we make a threshold observation about the unacceptable way in which Caulfield Inc. has presented the facts in its briefs. As it was entitled to do, Caul-

field Inc. appealed both from the rulings on summary judgment and from the final·result of the jury trial. Its presentation of the facts, however, makes no distinction between the facts that were before the court on the summary judgment motions and the facts that were presented during the trial. This is impermissible; our review of a grant of summary judgment is limited to the record presented to the district court at that time, and we do not rely on evidence later introduced at trial. See *U.S. East Telecommunications, Inc. v. U S West Telecommunications Services., Inc.,* 38 F.3d 1289, 1301 (2d Cir.1994); *Lippi v. City Bank,* 955 F.2d 599, 604 (9th Cir.1992). Granted, we take the record at summary judgment in the light most favorable to the nonmoving party. Nevertheless, if a party who has lost on a partial summary judgment believes that additional facts have come to light that entitle it to a trial, the proper procedure is to file a motion to vacate the partial summary judgment and to request either that the issue be added to the trial or that it be resolved as a matter of law in favor of the moving party. *Cf. United States v. Rode Corp.,* 996 F.2d 174, 179 (7th Cir.1993). Otherwise, partial summary judgment rulings cannot serve the important functions of narrowing issues for trial and requiring parties to come forward with substantial evidence in accordance with the schedule the trial judge has set.

 Even putting aside Caulfield Inc.'s unhelpful mixing of trial facts and the summary judgment record, its handling of the summary judgment motions must have tried the district judge's patience. When answering the defendants' proposed findings of fact, most of Caulfield Inc.'s objections were either non-responsive or argumentative. Many were based on Joe Caulfield's deposition. and affidavit testimony on issues where he plainly lacked personal knowledge. (For example, he testified about what "really" occurred at the October 1994 meeting to which he had not been invited—testimony that was necessarily speculative and lacking in foundation.) This too is insufficient. See *Haywood v. North American Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997). Rather than presenting the key facts in an organized manner, Caulfield Inc. thrust upon the court an

undifferentiated 387–page deposition with 105 attached exhibits. The district court, as was its right, see *Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995), chose not to scour this record looking for factual disputes. *Cf.* N.D. Ill. Local Rule 12(M), (N). We have no greater inclination to do so, even on this *de novo* review. Indeed, Caulfield Inc.'s appellate briefs barely skirt the line between cognizable argument and the kind of disorganized presentation that would justify an affirmance of the district court's partial summary judgment rulings on the ground that effective appellate review is impossible. *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 n. 1 (7th Cir.1996). We have restrained ourselves from taking this path only because the lower court reached the merits of Caulfield Inc.'s arguments, and because some of Caulfield Inc.'s legal points are ascertainable.

The difficulties inherent in Caulfield Inc.'s haphazard litigation of this case were compounded by its decision to plead multiple theories of liability against multiple defendants. As we mentioned earlier, in the August 26 grant of partial summary judgment, the district court rejected Caulfield Inc.'s principal tort-based claims against Litho, Steil, Walker, Melli, and the Melli, Walker firm. Caulfield Inc. alleged that some, but not all, of these defendants were guilty of tortious interference with contract, civil conspiracy, and fraudulent misrepresentation. On September 4, in another grant of partial summary judgment, the district court rejected the same claims against Hall, Shaw & Co., and the Insurers. For the sake of clarity, we have structured the remainder of the opinion defendant-by-defendant, so that each party can follow the disposition of the claims against it.

## A. Litho

■■■■ 1. Conspiracy. The district court rejected Caulfield Inc.'s claim that Litho, along with the other defendants, had conspired to interfere with the contract because it found no facts in the summary judgment record that could establish that any of the defendants had acted with "malice"—an element that it concluded was required as a matter of law for a civil conspiracy claim in Wisconsin. This finding was sound. In Wis-

consin, "[t]here can be no conspiracy" unless all conspirators act with "malice," meaning they must "intend[ ] to cause harm for harm's sake." See *Maleki v. Fine–Lando Clinic Chartered, S.C.,* 162 Wis.2d 73, 469 N.W.2d 629, 634 (1991); Wis. Stat. Ann. § 134.01. There was no evidence in the record at summary judgment from which a reasonable jury could have concluded that Litho bore such ill motive against Caulfield Inc. Moreover, because a party cannot interfere tortiously with its own contract, *Wausau Medical Ctr. v. Asplund,* 182 Wis.2d 274, 514 N.W.2d 34, 44 (1994); *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1375 (7th Cir.1990) (Wisconsin law), there is arguably a logical inconsistency in claiming Litho conspired with others to interfere with its own contract. While some states allow a party to be held liable for such conspiracies, see, *e.g., Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1234 n. 7 (Ind.1994); *Fox v. Deese,* 234 Va. 412, 362 S.E.2d 699, 708 (1987), others have rejected this cause of action. See, *e.g., Landstrom v. Shaver,* 561 N.W.2d 1, 16 (S.D.1997); *Applied Equip. Corp. v. Litton Saudi Arabia, Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454, 459–62 (1994). Although we entertained the possibility of such a claim in *Olympia Hotels,* 908 F.2d at 1375, we never squarely recognized the cause of action, and no Wisconsin court has done so, either. Because we agree with the district court that the record at summary judgment was devoid of evidence that Litho acted with "malice," we express no opinion at this time on whether Wisconsin would recognize a claim for conspiracy to interfere tortiously with one's own contract.

■■■■ 2. Fraud. The district court also rejected Caulfield Inc.'s allegation that Litho (and its president, Steil) fraudulently misrepresented that they intended to pay Caulfield Inc. for its services at the time the parties entered into the contract. *Cf. Hartwig v. Bitter,* 29 Wis.2d 653, 139 N.W.2d 644, 646–47 (1966). The court characterized Caulfield Inc.'s theory as relying on two pieces of evidence: first, that Litho (and Steil) benefitted from Caulfield Inc.'s services without paying for them; and, second, that they did not seriously attempt to negotiate Caulfield

Inc.'s 10% fee at the time they entered into the contract. The court then concluded that this "evidence" was insufficient to permit a reasonable juror to infer that Litho fraudulently harbored an intent to dishonor the contract. We agree.

 The first "fact" offers only hindsight: whatever benefits Litho may have reaped from Caulfield Inc.'s services tells us nothing about whether Litho *ex ante* planned on paying for them or not. This evidence is therefore irrelevant. Fed.R.Evid. 402. Regarding the unnegotiated 10% fee, it is simply too speculative on this record to conclude that Litho's failure to haggle over the fee reflected its present intention to not perform at the time it entered the contract. (Although the lower court additionally found that Caulfield Inc. had failed to introduce evidence suggesting that the 10% commission was unusually high, this characterization is contrary to the record since at summary judgment Caulfield Inc. referred to Joe Caulfield's deposition testimony that Steil (a party-opponent) had told him that other public adjusters had "called and offered to do [the job] ... for less than 10 percent." We do not fault the district court for failing to find this testimony, however, for the point was deeply buried: in response to Steil and Litho's one sentence proposed statement of fact on this point, Caulfield Inc. came back with a confusing, six-page (and nine-subparagraph) response, that in turn referenced Joe Caulfield's massive deposition. No matter. Even with this evidence before us—which Caulfield Inc.'s lawyer buried, and thus waived—we would conclude that Caulfield Inc.'s fraud claim was too speculative to survive summary judgment.)

*B. Steil*

 1. Tortious Interference. The district court dismissed the tortious interference claim against Steil, who is not a party to the Litho–Caulfield Inc. contract, based on Wisconsin law holding that a corporate officer acting within the scope of her authority cannot, as a matter of law, interfere with the corporation's contracts. See *Sprecher v. Weston's Bar, Inc.*, 78 Wis.2d 26, 253 N.W.2d 493, 499–500 (1977). At the summary judgment stage it was undisputed that Steil in his capacity as Litho's president had advised the

company not to perform under the Litho–Caulfield Inc. contract. Although Caulfield Inc. challenged Steil's proposition that "[a]ll of the actions taken in this matter by Robert Steil were in his capacity as an officer of Litho in a good faith effort to protect Litho's interests," it did so merely by reasserting the allegations in its complaint. Caulfield Inc. failed to point to any evidence in the record from which a reasonable juror could have concluded that Steil acted beyond the scope of his conditional privilege, and thus summary judgment on this claim was proper.

2. Conspiracy. Little need be said here other than to reiterate that the district court's finding that the record was devoid of any evidence tending to show a malicious motive disposes of Caulfield Inc.'s conspiracy claim against Steil as well. The most that the evidence showed with respect to Steil was that he became dissatisfied with Caulfield Inc.'s performance when the Insurers expressed their concerns to him and demanded the "sworn proof of loss." That evidence supports the inference that Steil was acting in the corporation's best interests, not that he was part of a conspiracy.

3. Fraud. The reasons why the fraud claim lacked merit against Litho apply with equal force to the claim against Steil.

*C. Jack Walker, Joseph Melli, and the Melli, Walker, Pease & Ruhly, S.C. Law Firm*

 1. Tortious Interference. Caulfield Inc.'s tortious interference claim against Litho's lawyers and their firm fails because one does not tortiously interfere with the contract of another by giving "honest advice" within the scope of a request for advice. See Restatement (Second) of Torts § 772 (1979). Wisconsin has never applied this section of the Restatement to a claim of privilege by an attorney. However, because the Wisconsin Supreme Court has accepted the "honest advice" privilege in general, *Liebe v. City Fin. Co.*, 98 Wis.2d 10, 295 N.W.2d 16, 18–19 (1980), and because that section expressly applies to legal advice, see § 772 cmt. c, we are certain that the Wisconsin courts would find that § 772 applies to the present case.

Although the lawyers never revealed to Caulfield Inc. the content of their communications with Litho, they submitted copies of the documents to the district judge for *in camera* inspection. Having reviewed the nearly 100 documents *de novo*, we agree with the district court that there is nothing there that suggests the lawyers' advice was anything but honest. Because the defendants voluntarily produced the documents for the district court's *in camera* inspection, it is unnecessary for us to consider Caulfield Inc.'s argument that the "honest advice" privilege cannot be invoked unless the client contemporaneously waives the attorney-client privilege. Similarly, because we agree with the district court that the prerequisites for the "honest advice" privilege were met, "[i]t is immaterial that [the advice giver] ... also profit[ed] by the advice." See Restatement (Second) of Torts § 772 cmt. c (1979). Accordingly, Caulfield Inc.'s argument that its termination conferred a financial benefit on the Melli, Walker firm, which was subsequently retained to represent Litho, is irrelevant. Finally, Caulfield Inc. argues that Walker and Melli failed to prove the "specific advice requested" by Litho. This argument is frivolous, since the "honest advice" privilege requires no such thing. Instead, the defendants needed to show only that Litho made a "request" for advice, see *id.* § 772(b), which is precisely what Litho's president Steil testified to in his affidavit submitted at summary judgment.

2. Conspiracy. Once again, the lack of evidence on malice dooms the conspiracy claim against the lawyers and their firm, just as it disposed of the claim against the other alleged co-conspirators.

#### D. *William J. Hall and L.J. Shaw & Co.*

■ 1. Tortious Interference. Caulfield Inc. argued unsuccessfully below that it was entitled to a trial on this claim at least against the adjusting firm Shaw & Co. and its employee William Hall because Hall told Litho that Caulfield Inc.'s "partial" claim of more than $4.5 million was overstated. But there is nothing *per se* wrong with Hall expressing doubts to Litho about Caulfield Inc.'s work or the proper amount of the claim. That is, in part, what the Insurers had hired Shaw & Co. to do. Indeed, had

the adjusters *not* negotiated firmly with Litho based on their belief that Caulfield Inc.'s partial claim was "borderline fraudulent," they would have been derelict in the duty of care they owed their principals, the Insurers. Most importantly, Caulfield Inc. left unrebutted the evidence that its work contained numerous duplications and inaccuracies. We know of no rule that prohibits the agent of one party truthfully to communicate the opinion to the other party that the latter's agent is performing badly, or that would then impose liability on the first agent if the second party acted on the information. In fact, the Restatement section discussed earlier creates an absolute privilege for the conveyance of "truthful information"—even in the absence of a request for such information. See Restatement (Second) of Torts § 772(a) & cmt. b (1979).

■ 2. Conspiracy. Recall that the district court disposed of Caulfield Inc.'s conspiracy claim against Shaw & Co. and Hall in a separate order granting partial summary judgment. Unlike the previous partial summary judgment in favor of Litho, Steil, and the Melli, Walker lawyers, the September 1994 order did not rely on the complete dearth of evidence of "malice"—though having reviewed the summary judgment record, this finding would have been justified. Instead, the district court rejected Caulfield Inc.'s civil conspiracy claim against Shaw & Co. and Hall because there was no evidence that either defendant had been aware that the Insurers had refused to attend the October 1994 meeting unless Joe Caulfield was not there. To the contrary, the defendants submitted unrebutted affidavit testimony at summary judgment that neither Shaw & Co. nor Hall had been involved in Litho's independent decision to terminate Caulfield Inc. All of Caulfield Inc.'s rebuttal "evidence" drew on Joe Caulfield's rank speculation. The district court therefore properly ignored it and granted summary judgment on these claims.

#### E. *General Casualty and Regent*

■ 1. *Tortious Interference*. Caulfield Inc. argued below that Regent (or General Casualty, as the case may be) tortiously in-

terfered with its Litho contract by paying $1 million in undisputed claims immediately after the October 1994 meeting that Joe Caulfield did not attend. We agree with the district court that the Insurers' decision to pay $1 million in undisputed claims is utterly nonprobative of Caulfield Inc.'s tortious interference claim, particularly since the $1 million sum was substantially less than both the $2 million Hall had estimated for Litho's losses and the $4.5 million Caulfield Inc. had claimed. As the district court rightly pointed out, Litho held a policy from the Insurers, and they were therefore obligated to pay legitimate claims within the scope of the policy. Their decision to do so, one step at a time, cannot give rise to the inference that Caulfield Inc. was being squeezed out of the picture. As mentioned earlier, Caulfield Inc. adduced no evidence that Hall had provided inaccurate or misleading information, and there was certainly not a shred of evidence indicating that the Insurers should have regarded his work product in that light.

■ 2. *Conspiracy.* Finally, we reach the last of Caulfield Inc.'s litany of empty claims. As Caulfield Inc. insists, we assume that the Insurers specifically asked that Joe Caulfield not attend the October 1994 meeting and that this suggests they were communicating to Litho their unwillingness to deal with Caulfield Inc. from then on. We assume also, as did the district judge, that the Insurers were motivated by a desire to minimize the amount they owed under the policy. None of this adds up to any kind of conspiracy against Caulfield Inc. See *Maleki*, 469 N.W.2d at 635 (no "malice" merely because defendant acted on "profit motive"). And, as mentioned above, Caulfield Inc. failed to produce any evidence that the Insurers' payment of the undisputed $1 million to Litho was even remotely improper, and thus the district court correctly granted summary judgment.

\* \* \*

■ Perhaps because every one of Caulfield Inc.'s rejected claims was baseless, on appeal (and seemingly below) Caulfield Inc.'s attorney chose to litigate through obfuscation. Caulfield Inc.'s voluminous, frequently inadmissible, and argumentative submissions at summary judgment were inconsistent with proper practice under that rule. Then, after losing at summary judgment on those claims, Caulfield Inc. had the audacity on appeal to suggest that the district court may have cynically refused to consider admissible evidence because of a concern over " 'practical management' of court resources." Although Caulfield Inc. appealed from both summary judgment and a jury verdict, its statement of facts in its appellate brief made no distinction between what was before the court at each stage. Instead, it quoted freely from both— and then referred this court to an unhelpful, two-volume appendix that spanned 1255 pages, plus an additional volume of exhibits nearly half that size. Many of its arguments were undeveloped, incoherent, or wildly speculative. This method of litigating is unbecoming for a member of the bar of this court, and should it occur again, we would be forced to consider sanctions. For now, we simply caution the attorneys for Caulfield Inc. to proceed more carefully in the future, and we AFFIRM the judgment of the district court.